# EXHIBIT 1
# part 1 of 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

| | | |
|---|---|---|
| In the matter of the Life | ) | CDC Number:  E-10079 |
| Term Parole Consideration | ) | |
| Hearing of: | ) | |
| | ) | |
| IVAN STAICH | ) | |
| _____ | ) | |

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 9 & 10, 2007

12:58 P.M.

PANEL PRESENT:

STAN KUBOCHI, Presiding Commissioner
ED ALVORD, Deputy Commissioner

OTHERS PRESENT:

IVAN STAICH, Inmate
MATTHEW LOCKHART, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____No        See Review of Hearing
_____Yes        Transcript Memorandum

Sarah M. Collins, Capitol Electronic Reporting

# I N D E X

|  | Page |
|---|---|
| Proceedings........................................ | 3 |
| Case Factors...................................... | 18 |
| Pre-Commitment Factors............................ | 20 |
| Post-Commitment Factors........................... | 25 |
| Parole Plans...................................... | 45 |
| Closing Statements................................ | 64 |
| Recess............................................ | 78 |
| Decision.......................................... | 79 |
| Adjournment....................................... | 95 |
| Transcript Certification.......................... | 96 |

3

1          **P R O C E E D I N G S**

2          **PRESIDING COMMISSIONER KUBOCHI:**  How you doing,

3    Mr. Staich?

4          **DEPUTY COMMISSIONER ALVORD:**  We are on the

5    record.

6          **INMATE STAICH:**  Okay.  How about you?

7          **PRESIDING COMMISSIONER KUBOCHI:**  Fine, thank you.

8    Thank you for asking.  We're on record for the matter of

9    Ivan Staich, last name is spelled S-T-A-I-C-H, CDC

10   number E-10079.  Mr. Staich, my name is Stan Kubochi,

11   Commissioner, K-U-B-O-C-H-I.  Could you speak, I'll move

12   it over for you.  Could you please state your name and

13   spell your last name?

14         **INMATE STAICH:**  My name is Ivan Staich,

15   S-T-A-I-C-H.

16         **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  In

17   the room is Matthew Lockhart, a representative of the

18   Orange County District Attorney's Office, and also

19   Deputy Commissioner Ed Alvord, A-L-V-O-R-D.  And the

20   purpose of calling your case at this time, sir, is that

21   your Parole Consideration Hearing is scheduled this

22   week.  And I note in looking at the records of your case

23   that you have declined the appointment of a state

24   appointed attorney; is that correct?

25         **INMATE STAICH:**  That's correct.

*Capitol Electronic Reporting*

1    **PRESIDING COMMISSIONER KUBOCHI:**  And that it is

2   your desire, I would surmise from that, since there is

3   no retained attorney, that you wish to represent

4   yourself at the Parole Consideration Hearing; is that

5   correct?

6        **INMATE STAICH:**  That's correct.

7        **PRESIDING COMMISSIONER KUBOCHI:**  And that is your

8   right.  And the only reason that I called you at this

9   time is to confirm what I call your pro per status.  And

10  it is a right that you are entitled.  And we will

11  proceed tomorrow on the hearing, not Friday.

12       **INMATE STAICH:**  Could I ask a question?

13       **PRESIDING COMMISSIONER KUBOCHI:**  Yes, you could

14  ask a question.

15       **INMATE STAICH:**  Title 15, Division 2, Section

16  2030 --

17       **PRESIDING COMMISSIONER KUBOCHI:**  Yes.

18       **INMATE STAICH:**  -- specifically says that when a

19  guy is in pro per that the District Attorney's Office

20  will not be present.

21       **PRESIDING COMMISSIONER KUBOCHI:**  They are going

22  to make a statement under 3043.5 that allows any member

23  of the public to give a statement.  Under the

24  circumstances I don't allow questions by the DA.

25       **INMATE STAICH:**  Okay.  And the other thing I

1    could put another little thing on there is 3043.5 was

2    enacted, it's the Gary Condit Bill.

3            PRESIDING COMMISSIONER KUBOCHI:   Yes, that's

4    correct.

5            INMATE STAICH:   That was enacted in 1984.

6            PRESIDING COMMISSIONER KUBOCHI:   That's correct.

7            INMATE STAICH:   Hines versus Gomez out of the

8    Ninth Circuit says that any regulation that comes in

9    after the effect of the prisoner's incarceration is a

10   violation of ex post facto.   So as far as that area of

11   law is concerned, I just wanted to put that on the

12   record.

13           PRESIDING COMMISSIONER KUBOCHI:   You have put it

14   on the record, sir.   But any member of the public may

15   give an opinion at a Parole Suitability Hearing.   And

16   that's the sole purpose of the --

17           INMATE STAICH:   Yes, but the statutory law,

18   though, went into effect in 1984.

19           PRESIDING COMMISSIONER KUBOCHI:   I understand

20   that.

21           INMATE STAICH:   I was arrested in '83 on this

22   crime.

23           PRESIDING COMMISSIONER KUBOCHI:   I understand

24   that.

25           INMATE STAICH:   You know, it's just, I know

6

1   you're going to do it, but you know, if I'm pro per, I

2   have to represent myself.  So I have to put things on

3   the record.

4        **PRESIDING COMMISSIONER KUBOCHI:**  You are entitled

5   to make your record.  So we will see you tomorrow.

6        **INMATE STAICH:**  Okay.

7        **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very

8   much.

9        **INMATE STAICH:**  Thank you.

10        **PRESIDING COMMISSIONER KUBOCHI:**  It's now 1:05.

11   And this matter is concluded until tomorrow, May 10th.

12        **INMATE STAICH:**  Okay.  All right.  Thank you.

13        **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.

14        **DEPUTY COMMISSIONER ALVORD:**  We're now going off

15   the record.

16            (Thereupon, a recess was

17            held off the record.)

18        **PRESIDING COMMISSIONER KUBOCHI:**  -- in that

19   chair.

20        **DEPUTY COMMISSIONER ALVORD:**  Now we're on the

21   record.

22        **PRESIDING COMMISSIONER KUBOCHI:**  We're on record

23   for the Subsequent Parole Consideration Hearing for Ivan

24   Staich, last name is spelled S-T-A-I-C-H, CDC number E-

25   10079.  Today's date is May 10th, 2007.  The time is

1   about 12:58 p.m.   We are located at Correctional

2   Training Facility at Soledad, California.   The record

3   should reflect at the outset that Mr. Staich has

4   previously been advised by Correctional Counselor

5   Verdesoto, V-E-R-D-E-S-O-T-O, concerning his rights for

6   a parole suitability hearing.   And that Mr. Staich has

7   elected to represent himself for today's proceedings.

8           Mr. Staich, we're going to go around the room and

9   identify ourselves.   When it is your turn, you're going

10  to state your name, spell your last and give us your CDC

11  number.   And we will start the preliminary issues in

12  regard to your hearing.   My name is Stan Kubochi,

13  K-U-B-O-C-H-I.

14          **DEPUTY COMMISSIONER ALVORD:**   My name is Ed

15  Alvord, A-L-V-O-R-D, Deputy Commissioner.

16          **DEPUTY DISTRICT ATTORNEY LOCKHART:**   Matt

17  Lockhart, L-O-C-K-H-A-R-T, Deputy District Attorney

18  Orange County.

19          **INMATE STAICH:**   Ivan Staich, S-T-A-I-C-H.

20          **PRESIDING COMMISSIONER KUBOCHI:**   And your CDC

21  number is E-10079?

22          **INMATE STAICH:**   That's correct.

23          **PRESIDING COMMISSIONER KUBOCHI:**   And Mr. Staich,

24  I want to review a few preliminary matters with you in

25  that you are acting in your own capacity as a lawyer.

1    And that term, I call as pro per status.  And you have

2    been previously advised of your right to have a state

3    appointed attorney and that an attorney would be

4    appointed to you at no cost if you were indigent; is

5    that correct?

6         INMATE STAICH:  That's correct, Sir.

7         PRESIDING COMMISSIONER KUBOCHI:  And you have

8    waived having an attorney.  And you wish to represent

9    yourself?

10        INMATE STAICH:  Yes, Sir.

11        PRESIDING COMMISSIONER KUBOCHI:  And you have

12   also been noticed, given notice of the week of this

13   hearing by your correctional counselor?

14        INMATE STAICH:  Yes, Sir.

15        PRESIDING COMMISSIONER KUBOCHI:  And you, could

16   you tell me about your review of your central file,

17   whether you have reviewed your central file?

18        INMATE STAICH:  Yes, I have reviewed the central

19   file.

20        PRESIDING COMMISSIONER KUBOCHI:  Okay.

21        INMATE STAICH:  Except for anything that was not

22   allowed to be reviewed.  There are restricted materials

23   under the 1030 I believe it is.

24        PRESIDING COMMISSIONER KUBOCHI:  I assure you,

25   Mr. Staich, I don't have anything that you don't have

1  because I don't get any restricted material.

2         INMATE STAICH: Okay.

3         PRESIDING COMMISSIONER KUBOCHI: In other words,

4  you get a copy of the Board report package. That's what

5  I have. That's what the DA has. In fact, what I'm

6  going to do here is because we're going over preliminary

7  matters, right at the top of that Board packet, sir, you

8  will see a document checklist. And from, take for a

9  moment a review of that checklist because these are the

10  documents that I have and the DA has been provided. I

11  don't have anything more than what has been indicated.

12  And you should have the same form in the first page of

13  your packet.

14         INMATE STAICH: Let the record reflect that that

15  is 100 percent true.

16         PRESIDING COMMISSIONER KUBOCHI: Thank you very

17  much, Mr. Staich. And that is the correct

18  pronunciation, Staich?

19         INMATE STAICH: Yes, that is.

20         PRESIDING COMMISSIONER KUBOCHI: I want to assure

21  you that --

22         INMATE STAICH: It's good that you are able to do

23  that. Not many people can.

24         PRESIDING COMMISSIONER KUBOCHI: -- proper

25  respect. If I slip, it's not out of lack of respect.

1   The correct pronunciation of your name is very important

2   to me.

3          INMATE STAICH:   Okay.   Thank you.

4          PRESIDING COMMISSIONER KUBOCHI:   Mr. Staich, in

5   regard to further rights that you had in regard to this

6   hearing, you have been afforded a copy of the same

7   material that I have and the District Attorney has been

8   presented.   And that's called the Board report.   And are

9   you prepared to proceed with your Parole Suitability

10  Hearing today?

11         INMATE STAICH:   Yes, I am, Sir.

12         PRESIDING COMMISSIONER KUBOCHI:   Sir, I would

13  like to discuss with you your rights pursuant to the

14  American with Disabilities Act.   And I would note that

15  in reviewing your personal and social history before

16  this hearing that you have had different and numerous

17  physical injuries and ailments.   I believe you have an

18  ongoing problem with your back; is that correct?

19         INMATE STAICH:   Yes, that's true, Sir.

20         PRESIDING COMMISSIONER KUBOCHI:   And that your

21  Correctional Counselor Verdesoto, as I've referred to

22  before, reviewed your central file.   And Correctional

23  Counselor Verdesoto noted on a BPT 1073 form, that is

24  commonly known as a notice and request for assistance at

25  Parole Hearings, that you have physical limitations

1  caused by the various injuries and physical problems

2  that you have had.  And that those injuries and medical

3  procedures have been documented in what they call a CDC

4  128-C.  As you sit here now, are you in any physical

5  pain that would interfere with your ability to

6  communicate effectively with this Panel?

7       **INMATE STAICH:**  Not to effectively communicate.

8  I do have problems, though, I have to stretch a lot.

9  Other than that, that's all that is really needed to be

10  required.

11       **PRESIDING COMMISSIONER KUBOCHI:**  We will let you

12  stretch if you give us any indication that you need to

13  do so.

14       **INMATE STAICH:**  Okay.  Thank you.

15       **PRESIDING COMMISSIONER KUBOCHI:**  Have you taken

16  any medications that interfere with your ability to

17  think clearly, sir?

18       **INMATE STAICH:**  No, ibuprofen 600 is all that

19  they prescribe for this type of spinal injury, you know.

20  It's prison.  They don't give out any hard type drugs

21  for --

22       **PRESIDING COMMISSIONER KUBOCHI:**  Central nervous

23  type drugs?

24       **INMATE STAICH:**  Yeah, you just have to live with

25  it, you know, pretty much.

1    **PRESIDING COMMISSIONER KUBOCHI:** And were you

2    able to review your central file?

3    **INMATE STAICH:** Yes.

4    **PRESIDING COMMISSIONER KUBOCHI:** I note, sir,

5    that on the most recent BPT 1073 that you have a grade

6    point average of 12.9 on reading; is that correct?

7    **INMATE STAICH:** Yes, that's probably about right.

8    **PRESIDING COMMISSIONER KUBOCHI:** And you have

9    received your GED while in an institution; is that

10   correct?

11   **INMATE STAICH:** Yes, previously, yeah, I did

12   receive that in the CYA when I was 16 years old.

13   **PRESIDING COMMISSIONER KUBOCHI:** Good, that's

14   good.  Do you believe that you're thinking clearly

15   today?

16   **INMATE STAICH:** Yes, I am, 100 percent.

17   **PRESIDING COMMISSIONER KUBOCHI:** Do you have any

18   hearing problems?

19   **INMATE STAICH:** No, Sir.

20   **PRESIDING COMMISSIONER KUBOCHI:** I notice you're

21   not wearing any glasses.  You can read and see clearly

22   without glasses?

23   **INMATE STAICH:** Yeah, I can see and read pretty

24   good.  I do have eye problems, but not enough that would

25   warrant me not to be able to read something or you know,

1  any problems to that degree.

2       **PRESIDING COMMISSIONER KUBOCHI:**  Good, good, sir.

3  Now this may sound like a silly question, but in the

4  last 24 hours have you ingested or consumed anything

5  that could affect your ability to think clearly today?

6       **INMATE STAICH:**  No, I have not, Sir.

7       **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very

8  much.  And could you briefly state the physical

9  disabilities that you have?

10      **INMATE STAICH:**  The physical disabilities I have

11  is I sustained a 357 magnum colt round through the left

12  side of my body, which entered the left bicep area, went

13  into the shoulder, the copper jacket and that blew

14  apart.  The main round bounced off my neck, went down

15  and blew a hole through my lung, shattered 11 ribs.  And

16  it's stuck down here.  All the pieces of metal that

17  broke apart are all up in the upper chest.  So I have

18  problems with gripping, you know, due to the nervous

19  damage and real bad neck problems.

20          And also, because of all that, it related to my

21  spinal column.  And there is severe damage down there,

22  herniated disc, four bulging discs, herniations in

23  there.  You name it, as far as the back is concerned,

24  it's pretty bad shape.

25      **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Thank you

1   for clarifying these things and explaining.  I just want

2   to reiterate, if you're in any pain or if you feel the

3   need to stretch to get more comfortable, just let us

4   know.

5        **INMATE STAICH:**  Okay.  Thank you, Sir.

6        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  These are

7   not formal judicial proceedings.  It's a hearing simply

8   to gather facts and discuss your suitability for parole

9   at this time.  Sir, this is a Subsequent Parole

10  Suitability Hearing.  And this hearing is being

11  conducted pursuant to the Penal Code and the Rules and

12  Regulations of Title 15 of the California Code of

13  Regulations.

14       The purpose of today's hearing is to, once again,

15  consider your suitability for parole.  In doing so, we

16  will consider the number and nature of the crimes for

17  which you were committed.  I will be discussing your

18  prior criminal history, your prior personal and social

19  history before incarceration and your parole plans.

20       Commissioner Alvord will be discussing your

21  behavior and programming since your commitment.  And I

22  would like to advise you that if at any time during

23  these proceedings, if you have documents that you

24  believe would support a finding of suitability, you have

25  a right to present those documents for consideration.

1       We will reach a decision today, sir, and inform

2   you of whether or not we find you suitable for parole

3   and the reasons for our decision.  If you are found

4   suitable for parole, the length of your confinement will

5   be explained to you.  Before we recess for

6   deliberations, the Panel may ask you questions.

7       And as I indicated to you yesterday, and I will

8   go into that a little bit further, I'm going to restrict

9   the District Attorney's participation today to giving us

10  a closing statement.  And you will be allowed to make a

11  statement on your behalf telling us why you believe you

12  are suitable for parole.

13      We will then recess, clear the room and

14  deliberate.  Once we have completed our deliberations,

15  we will resume the hearing and announce our decision.

16  Sir, the record should reflect that yesterday on May

17  9th, the Panel noted that you were representing yourself

18  and that we called you into the hearing room to discuss

19  what I call reconsideration of the right to represent

20  yourself, that is the reconsideration that you wished a

21  state appointed attorney at no cost if you were

22  indigent.  And during yesterday's brief proceedings, you

23  clarified that it is your continued wish to represent

24  yourself.  It is a right that these Panel honors because

25  that is a right that you are entitled to.  And therefore

1    we will proceed as indicated.

2         The California Code of Regulations states that,

3    regardless of time served, a life inmate shall be found

4    unsuitable for and denied parole if, in the judgment of

5    the Panel, the inmate would pose an unreasonable risk of

6    danger to society.  Parole may be denied if you, excuse

7    me.  You have certain rights.  We discussed notice of

8    this hearing.  We have also discussed your right to

9    central file.  You have a right, sir, to have your case

10   heard by an impartial Panel.  Are you prepared to

11   proceed this afternoon?

12        **INMATE STAICH:**  Yes, I am, Sir.

13        **PRESIDING COMMISSIONER KUBOCHI:**  Sir, we will

14   reach a decision today, as I've indicated.  We will give

15   you a copy of that decision in writing.  That decision

16   becomes final within 120 days.  A copy of the decision

17   and a copy of the transcript will be given to you.

18   Since you are acting as your own attorney, you are

19   responsible for any issues in regard to appeal.  The

20   Panel does not give any advice on your appeal rights.

21   So you are not required to admit or discuss your

22   offense.  However, this Panel does accept as true the

23   findings of the Orange County Superior Court.  Do you

24   understand that?

25        **INMATE STAICH:**  Yes, I do.

17

1      **PRESIDING COMMISSIONER KUBOCHI:**  Commissioner

2   Alvord, is there any confidential material that will be

3   relied upon by this Panel in reaching a decision today?

4      **DEPUTY COMMISSIONER ALVORD:**  There is

5   confidential material.  We will not be using it today.

6      **PRESIDING COMMISSIONER KUBOCHI:**  We have reviewed

7   the hearing checklist of documents.  And you have

8   acknowledged the fact that I have what you have,

9   Mr. Staich.

10      **INMATE STAICH:**  Okay.

11      **PRESIDING COMMISSIONER KUBOCHI:**  I don't have

12   anything else.  Will you be discussing the facts of the

13   homicide with us today?

14      **INMATE STAICH:**  I will discuss any facts that is

15   written in the Appellate Court Decision out of the

16   Fourth Appellate District.

17      **PRESIDING COMMISSIONER KUBOCHI:**  Yes, I was going

18   to read those are the facts of the case and nothing

19   more.

20      **INMATE STAICH:**  I have no problem with discussing

21   those facts.

22      **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Will you

23   raise your right hand please?  Do you solemnly swear or

24   affirm that the testimony that you give in this hearing

25   will be the truth, the whole truth and nothing but the

1  truth?

2      **INMATE STAICH:**  I do, Sir, 100 percent.

3      **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very

4  much.  Based on the Appellate Decision in this case,

5  starting at page two, and I will interweave those facts.

6      A jury convicted Ivan Staich of second degree

7  murder and attempted murder.  A firearm use allegation

8  was found true as to the murder.  And a great bodily

9  injury allegation was sustained as to the attempted

10  murder in violation of Penal Code 664/187 the murder

11  charge would have been PC, Penal Code, 187.  That was

12  murder in the second degree.

13      There was a prior felony conviction alleged on

14  that information that bifurcated and heard separately

15  and considered separately.  And as a result of that

16  conviction in docket number C-53851, you received a

17  sentence of 30 years to life for the violations I have

18  noted, that your life term began on or about September

19  11th, 1983.  And that your minimum eligible parole date

20  was September 11th, 2003.  And I'm just reading right

21  out of the Appellate Decision.

22          "Staich's relationship with Cynthia Bess,

23          B-E-S-S, was interrupted in 1980 when he was

24          convicted of a federal offense and imprisoned in

25          the Terminal Island Federal Penitentiary.  The

1    pair communicated by telephone and mail until

2    1983.  Staich was released to a halfway house in

3    Long Beach on June 9th of that year.  When Bess

4    visited him there on several occasions, she was

5    affectionate.  But in the meantime she had met

6    Robert Topper, spelled T-O-P-P-E-R.

7            "And as her interest in," and I'm going to

8    just state this, paraphrase this for clearer

9    understanding, as her interest in Topper grew,

10   she communicated less frequently with Staich.

11   "He was returned to prison on June 29th after

12   breaking into Bess' former residence in search of

13   her and lost direct contact while serving the

14   balance of his sentence.

15           "Frustrated with the uncertainty of the

16   situation, Staich sent Bess letters in which he

17   alternately professed his love and threatened to

18   harm her if she left him for another man.  He

19   made at least 67 collect telephone calls to Bess'

20   father in July and August, 1983 in a fruitless

21   effort to locate her.  He also telephoned Topper

22   on numerous occasions and repeated threatened

23   him, warning him to stay away from Bess.  He did

24   not discover Bess' whereabouts during this time.

25           "Staich was released from Terminal Island

1        on November 14th, 1983 and learned Bess was

2        staying at her grandparents' home.  Although he

3        was apparently unaware she had married Topper.

4        In the early morning hours of December 8th, 1983

5        Staich went to the grandparents' house armed with

6        a hammer.  He cut the telephone wires to the

7        residence and then kicked in the front door.

8               "Topper was brutally slain.  Numerous

9        hammer blows were inflicted to Topper's head.

10       And he was shot four times at close range in the

11       back in the neck.  Bess survived multiple blows,

12       probably with a handgun to her head.  Her skull

13       was crushed, however.  And the resulting brain

14       damage left her incompetent to testify.  Staich

15       himself was shot once or twice suffering wounds

16       to a hand and arm and the ribcage.  He went to a

17       nearby home for help."

18             Mr. Staich, according to the probation report,

19    Cynthia Bess underwent two lobotomy surgeries after this

20    incident.  And in regard to your prior record, I'm

21    looking at the probation report filed in Orange County

22    January 11th, 1974, a peace disturbance.  You were given

23    a fine.  There was summary probation.  There is an entry

24    for December 13th, 1977, escape from Riverside County

25    Jail.  That docket number was CR-15566.  It was a

1   conviction for 4532, Subdivision B of the Penal Code,

2   escape from jail.

3          An entry for July 21st, 1978, there was a

4   diagnostic evaluation ordered to be conducted by the

5   Department of Corrections pursuant to Penal Code Section

6   120303.  And that subsequently you received a two-year

7   state prison sentence.  And you were paroled on or about

8   October 29th, 1979.  In April, 1980 your parole was

9   revoked.  On April, excuse me, August 5th, 1980 you were

10  paroled again.

11         There is an entry dated March 6th, 1980, a

12  federal offense, 18 US Code Section 876, mailing

13  threatening communications, Federal Court Eastern

14  District docket 80-00027-01.  There is an entry that

15  shows July 2nd, 1980, five years state prison, five

16  years imprisonment.  That wouldn't be a state

17  imprisonment.  That's imprisonment.

18         There is a caption in the probation report that

19  says on or about November 21st, 1978 Ms. Anna Buckman of

20  Vacaville received a threatening letter addressed to her

21  daughter, Cindy Dustin.  In the letter the defendant,

22  Staich, threatened to kill Cindy Dustin because she

23  intended to testify.

24         It was determined that the letter had been mailed

25  from a jail facility.  And that Staich ultimately

1    escaped from the Riverside County Jail.  The defendant

2    continued to send threatening letters to the Buckmans,

3    that Mr. Staich was ultimately arrested in the Vacaville

4    area on the campus of a high school where Cindy Dustin

5    was enrolled.  Probation notes that you received your

6    GED while in the Youth Authority.

7         In the Board report of 2202, and I only selected

8    that, sir, because it has personal factors that you were

9    one of six children raised by your parents in Lake

10   Ellsinore, that you had told a correctional counselor

11   that your parents were abusive towards you as you became

12   older.  That you were in a series of foster homes since

13   about the age of 11 until you were committed to the

14   Youth Authority when you were 16 years old.  Sir, as of

15   this date, have you ever been married?

16        **INMATE STAICH:**  Yes, I have.

17        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  And could

18   you tell me whether or not you're currently married?

19        **INMATE STAICH:**  No, I'm not.  I'm engaged to be

20   married.

21        **PRESIDING COMMISSIONER KUBOCHI:**  That's my

22   understanding.  But I would rather just converse with

23   you to fill in everything.

24        **INMATE STAICH:**  Yeah.

25        **PRESIDING COMMISSIONER KUBOCHI:**  When were you

1    married, sir?

2          **INMATE STAICH:**  I was married on April 14th, 1990

3    in Folsom State Prison to Paula Rowlin.

4          **PRESIDING COMMISSIONER KUBOCHI:**  And when did

5    that marriage terminate?

6          **INMATE STAICH:**  January 27th, 1997.

7          **PRESIDING COMMISSIONER KUBOCHI:**  And how long

8    have you had your current relationship with your fiancé?

9          **INMATE STAICH:**  Since 1999 to present date.

10          **PRESIDING COMMISSIONER KUBOCHI:**  And are you the

11   father of any children?

12          **INMATE STAICH:**  Not that I'm aware of.

13          **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  And

14   before the life crime in this case, that would have been

15   in 1983, would you characterize yourself as having a

16   substance abuse problem or no substance abuse problem?

17          **INMATE STAICH:**  No substance abuse problem.

18          **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Thank

19   you.  At this time I'm going to have Commissioner Alvord

20   discuss your post-commitment factors.

21          **INMATE STAICH:**  Could I put one objection after

22   that statement, though?

23          **PRESIDING COMMISSIONER KUBOCHI:**  Yes, you may.

24          **INMATE STAICH:**  People versus Johnson, '83 Cal

25   Reporter 2nd, 4/23/1999, page 425, probation officer's

1    reports are only discretionary.  It can't be used as the

2    actual factual basis for denying parole.  There has to

3    be other evidence to substantiate it besides the

4    probation officer's report.

5            **PRESIDING COMMISSIONER KUBOCHI:**  We're just

6    noting facts surrounding the conviction.

7            **INMATE STAICH:**  I know.

8            **PRESIDING COMMISSIONER KUBOCHI:**  Convictions

9    without facts mean very little, Mr. Staich.  It could

10   work both ways.

11           **INMATE STAICH:**  I understand.  I just wanted to

12   put that on the record.

13           **PRESIDING COMMISSIONER KUBOCHI:**  Yes, you may.

14           **INMATE STAICH:**  That's the basis of some type of

15   a long denial.

16           **PRESIDING COMMISSIONER KUBOCHI:**  Yes, you may.

17           **INMATE STAICH:**  Okay.

18           **PRESIDING COMMISSIONER KUBOCHI:**  I'm simply

19   indicating to you that for instance, if there was a ADW

20   245, the facts of the case could be real innocuous or

21   they could be real serious.  Sometimes lack of facts are

22   adverse.  Sometimes they are positive.

23           **INMATE STAICH:**  That's correct.

24           **DEPUTY COMMISSIONER ALVORD:**  Good morning,

25   Mr. Staich, once again, good afternoon.

25

1          INMATE STAICH:  Good afternoon, Sir.

2          DEPUTY COMMISSIONER ALVORD:  We're here to

3    discuss your post-conviction factors as well as some of

4    your prior events, but primarily your post-conviction

5    factors.  I would ask you to listen very carefully.  If

6    I miss something, you be sure to let me know.

7          INMATE STAICH:  Okay.

8          DEPUTY COMMISSIONER ALVORD:  I have tried to go

9    through your C file, but sometimes I don't find

10   everything that is in there.  Okay?

11         INMATE STAICH:  I know, it's kind of thick.

12         DEPUTY COMMISSIONER ALVORD:  Yes.  First of all,

13   let me tell you that you apparently are in custody

14   medium A; is that correct, sir?

15         INMATE STAICH:  That's correct.

16         DEPUTY COMMISSIONER ALVORD:  And your

17   classification score is 19?

18         INMATE STAICH:  Yeah, that's based on the new

19   classification system that anybody with a life top

20   sentence is only allowed to be in a level two prison.

21         DEPUTY COMMISSIONER ALVORD:  Right.  You have a

22   life override of 19 points.

23         INMATE STAICH:  Yeah.

24         DEPUTY COMMISSIONER ALVORD:  You have had that

25   life override since 2002.  I would commend you, sir.

1    That's very good.  We strive to have inmates who get to

2    the minimum eligible point level, which you have done.

3    So that is commendable for you.  This is a Subsequent

4    Hearing.  Apparently you did have a previous hearing on

5    November 5th, 2005 that resulted in a four-year denial.

6    There is also an indication in the file that you

7    received a GED.  And I note today that you said you

8    received it in YA?

9        INMATE STAICH:  That's correct.

10       DEPUTY COMMISSIONER ALVORD:  I don't find a copy

11   of that.  Did you happen to see a copy when you did your

12   Olson review?  You may not have cared, but --

13       INMATE STAICH:  It was probably written in some

14   other document, the actual reference to that.  But I

15   have given that to the counselor before.  Where she

16   placed it, you know, as far as, you know how that goes.

17       DEPUTY COMMISSIONER ALVORD:  Yes.

18       INMATE STAICH:  There is a lot of inmates in

19   here.  And the counselors' desks are just backed up with

20   papers.  So --

21       DEPUTY COMMISSIONER ALVORD:  There is

22   reference --

23       INMATE STAICH:  -- sometimes it don't get to

24   where it's supposed to.  But you know, that's just part

25   of our system.

1      **DEPUTY COMMISSIONER ALVORD:**  There is enough

2   reference in here that I don't doubt for a moment that

3   you obtained that.  You might try to, next time you see

4   your counselor, give it again.

5      **INMATE STAICH:**  I got a copy if it, yeah.  I'll

6   give her another one.

7      **DEPUTY COMMISSIONER ALVORD:**  Yes.  All right.

8   You also have a TABE score of 12.9.  That's the highest

9   level one can reach in a TABE score as far as your

10  reading ability and comprehension.  So that's very good.

11  Now you also have a global assessment of functioning at

12  80.  And again, that's rather high.  You have two prior

13  prison terms.  The Chair went into some of those.  You

14  also had a revocation apparently in 1977, I'm sorry,

15  1979.  And I wasn't sure, what was that revocation for?

16      **INMATE STAICH:**  In '79?

17      **DEPUTY COMMISSIONER ALVORD:**  Yes.

18      **INMATE STAICH:**  That was based on a walk away

19  escape from the county jail, Riverside County Jail.

20      **DEPUTY COMMISSIONER ALVORD:**  Well that was how

21  you, that was one of your prison terms.

22      **INMATE STAICH:**  That was the only prison term

23  I've had.

24      **DEPUTY COMMISSIONER ALVORD:**  Right.  And then you

25  were on parole.

1    **INMATE STAICH:**  Yeah, I was on parole.

2    **DEPUTY COMMISSIONER ALVORD:**  And your parole was

3  revoked.

4    **INMATE STAICH:**  Correct.  That's what I'm saying.

5  The parole was revoked based on communication with my

6  other fiancé supposedly at the time.

7    **DEPUTY COMMISSIONER ALVORD:**  All right.

8  That's --

9    **INMATE STAICH:**  Those charges were subsequently

10  dismissed.

11    **DEPUTY COMMISSIONER ALVORD:**  All right.  I wasn't

12  sure what that was, but I did note in the file that it

13  indicated that there was a revocation.  And you did

14  about six months on that revocation.

15    **INMATE STAICH:**  Yeah.

16    **DEPUTY COMMISSIONER ALVORD:**  And then you were

17  paroled in 1980.  And you remained free until 1983,

18  which is when the life crime occurred.

19    **INMATE STAICH:**  Yeah.

20    **DEPUTY COMMISSIONER ALVORD:**  All right.  I just

21  wanted to make sure I had that correct.

22    **INMATE STAICH:**  Okay.

23    **DEPUTY COMMISSIONER ALVORD:**  I also had an

24  opportunity to review a current status report.  This was

25  a staff report prepared on 3/26/2007 by Correctional

1    Counsel Juan Lopez.  That indicates again, that your

2    custody level is medium A, that you have been assigned

3    as a porter from November 14th, 2006 to the present

4    time.  I could find no CDC 101s for that time period.

5    Is that correct, sir?

6            INMATE STAICH:  Yeah, that's correct.

7            DEPUTY COMMISSIONER ALVORD:  Thank you.  It also

8    didn't indicate that at least from the last time period

9    of the last year that you had participated in any self-

10   help programs.  But I will tell you that then I found in

11   April of 2007 apparently you did participate in a two-

12   week seminar on how to become a sober father and not get

13   angry; is that correct?

14           INMATE STAICH:  There has been way more than

15   that.  But that's correct, too.

16           DEPUTY COMMISSIONER ALVORD:  Okay.

17           INMATE STAICH:  Yeah, there has been --

18           DEPUTY COMMISSIONER ALVORD:  I'll get to all your

19   chronos.

20           INMATE STAICH:  Yeah, there is several of those.

21           DEPUTY COMMISSIONER ALVORD:  All right.  I will

22   get to those.  Then going on with the staff report, and

23   this was the staff report of November, 2006.  And this

24   report was prepared by Correctional Counselor Verdesoto,

25   V-E-R-D-E-S-O-T-O.  And that was done September 1st,

1   2006.  And on that report it indicates that for the most

2   part all of your self-help has remained the same since

3   the previous Board, and that was the Board of 2002, with

4   the exception that you have participated in Anger

5   Management.

6          The report goes on to indicate that you continue

7   to remain disciplinary free.  And pursuant to that, I

8   had an opportunity then to go back and take a look at

9   your discipline history.  And what I found, sir, I found

10  eight 128s.  The most recent being violation of grooming

11  standards.  And I found nine 115s, the most recent being

12  2001.  I will tell you, sir, that of the nine 115s that

13  I found, six were for grooming standards.  And I know

14  that that tends to be in a state of flux within the

15  institution.  And we consider that as such.  I did find

16  three 115s, one in 1999 for disobeying an order, one in

17  1996, which was for threats.  And apparently for that

18  one you received a SHU term?

19          **INMATE STAICH:**  The SHU term was overturned later

20  on.  And it was reduced down on a modification order.

21          **DEPUTY COMMISSIONER ALVORD:**  Correct, it stayed

22  as a 115 as I understand it.

23          **INMATE STAICH:**  Yeah, it did.

24          **DEPUTY COMMISSIONER ALVORD:**  All right.  I wanted

25  to make sure, because that's what I saw in the file.

1        INMATE STAICH:  Yes.

2        DEPUTY COMMISSIONER ALVORD:  And then there was a

3   1993 for possession of dangerous property.  And those

4   were the only disciplines that I was able to find.  I

5   then went and reviewed your most recent psychological

6   evaluation.  That was performed on February 4th, 2006 by

7   Dr. McComber.  And again, I'll point out those portions

8   that I thought were particularly salient.

9        INMATE STAICH:  Okay.

10       DEPUTY COMMISSIONER ALVORD:  One thing that was

11   somewhat interesting is there was an introduction by the

12   doctor which described why the, that particular

13   evaluation was being done.  And it was being done

14   apparently as a result of a 602 that you filed

15   requesting that your last psychological evaluation by

16   Dr. and it's Gamard, G-A-M-A-R-D, at CTF Soledad, dated

17   2/25/02 be corrected.

18       Apparently on page seven of that evaluation,

19   Dr. Gamard stated that you had a pattern of possessive

20   jealousy towards girlfriends and an inability to

21   tolerate being rejected by them or to allow them to be

22   possessed by any other man.  You stated that the

23   psychologist was not aware of the true facts of your

24   relationship with women.  And as a result, he

25   erroneously concluded that there is a pattern there when

1    the facts do not substantiate that.  And as a result,

2    that appeal was granted in part.  And a new

3    psychological evaluation was ordered.

4            INMATE STAICH:  Correct.

5            DEPUTY COMMISSIONER ALVORD:  All right.  I'm not

6    going to go through all of the facts and materials that

7    were provided to the psychologist.  You have that report

8    as does the Board.

9            INMATE STAICH:  Yeah.

10           DEPUTY COMMISSIONER ALVORD:  I will go on though,

11   to the psychologist's assessment.  He first of all found

12   that you were well oriented throughout the interview.

13   He says you do wear a beard.  Is this the same beard?

14           INMATE STAICH:  Yeah.

15           DEPUTY COMMISSIONER ALVORD:  Okay.

16           PRESIDING COMMISSIONER KUBOCHI:  I hope so.  It's

17   the same person.

18           DEPUTY COMMISSIONER ALVORD:  Yes, but it doesn't,

19   the reason I say that is that is it looks more to me

20   like a goatee.  But he makes reference to a beard.

21           INMATE STAICH:  Well, you know, he, I don't know.

22   This is the way I've had it.

23           DEPUTY COMMISSIONER ALVORD:  So it's the same?

24           INMATE STAICH:  This is the way that I've had it.

25   You can look at my ID.  It's been like that for years.

1          **DEPUTY COMMISSIONER ALVORD:**  Okay.  I certainly

2    believe you.  I just was curious because when I read it,

3    it says, that you wear a beard.

4          **INMATE STAICH:**  Yeah.

5          **DEPUTY COMMISSIONER ALVORD:**  And when you came in

6    here today, well that didn't look like a beard to me.

7    But anyway, so be it.

8          **INMATE STAICH:**  Yeah.

9          **DEPUTY COMMISSIONER ALVORD:**  All right.

10          **PRESIDING COMMISSIONER KUBOCHI:**  Let's call it a

11    difference in grammar.

12          **INMATE STAICH:**  It's pretty much close to the one

13    that you're wearing.

14          **DEPUTY COMMISSIONER ALVORD:**  Yes, yes.

15          **INMATE STAICH:**  Let's put it that way.

16          **PRESIDING COMMISSIONER KUBOCHI:**  Facial hair.

17          **DEPUTY COMMISSIONER ALVORD:**  I thought it was a

18    goatee.

19          **INMATE STAICH:**  Maybe a little bit longer.

20          **PRESIDING COMMISSIONER KUBOCHI:**  Facial hair.

21          **DEPUTY COMMISSIONER ALVORD:**  And he said that you

22    wear that as a result of your Nazarite religious beliefs

23    that require that you not cut your beard.  He said that

24    your thinking was rational and coherent.  Your speech

25    was normal, fluent and goal oriented.  Eye contact was

1  very good.  Intellectually he found you functioning in

2  the average range.  Affect was appropriate.  He found no

3  evidence of anxiety or depression.

4       He, meaning you, related during the interview in

5  an earnest, sincere, concerned matter because you wanted

6  to get the facts of your case straight.  Your judgment

7  was intact.  Your memory was intact.  Your insight and

8  self-awareness appears to be very good.  He then

9  performed a Minnesota Multi-phasic Personality Inventory

10  and found that all of your scores were in the average

11  range.

12       He then noted his diagnostic impressions.  Axis

13  I, he found no mental disorder.  Axis II, no personality

14  disorder.  Axis III, there is a history of gunshot

15  wounds and lower back and neck pain.  Axis V, IV, I'm

16  sorry, his life term incarceration.  And he found a

17  global assessment of functioning at 90, higher than the

18  previous one, which was at 80.

19       He went on then to discuss your life crime.  And

20  he found that you fully accepted responsibility for the

21  victim's death.  You openly accepted the fact that you

22  had acted irresponsibly and impulsively and that you

23  caused hurt, pain and the death of the victim.  He felt

24  you were very remorseful about your past behavior.

25       He then did an assessment.  He did note that you

35

1   received the SHU term in 1996 for mailing a threatening

2   letter, a threatening sounding letter, excuse me,

3   threatening sounding letter to your wife.  That you have

4   matured socially, morally and spiritually since your

5   incarceration.  You are a much different individual now

6   than at the time of the commitment offense.

7          Your potential for violence in the institution is

8   definitely below average in comparison to other inmates.

9   In dealing with your violence potential in a free

10  community, he states your potential for dangerous

11  behavior if released to the community is estimated to be

12  no higher to the average citizen in the community.  This

13  is based on the fact that his recent MMPI-Two, shows him

14  to be a very non-aggressive, thoughtful, pro-social

15  individual who does not have any evidence of personality

16  disorder or antisocial thinking or values.

17         Although again, this needs to be interpreted with

18  some caution, as you openly admit making mistakes when

19  you were younger and have been remorseful for them.  He

20  then performed a Level of Service Inventory revised

21  test.  He goes on to describe that basically what he

22  found was that your score places you in the 1.8

23  cumulative frequency for prison inmates.  What that

24  means is if 100 men are released from parole, it is

25  anticipated that you would do better than 98 of them.

1    And that he feels, is an extremely low risk level.

2        He goes on to conclude that there is no mental or

3    emotional problems in this case that would interfere

4    with parole planning.  You have obtained vocational

5    training in vocational motorcycle repair, vocational

6    welding and vocational woodshop.  He has worked

7    throughout his life and has a strong work ethic.

8        You currently have some physical problems due to

9    your gunshot wound and the bullet fragment that you

10   still carry in your back.  He felt you were very

11   interested in working when you are released and you have

12   strong family support as well as a fiancé.  And he felt

13   that you have valid residence placement as well as some

14   job offers.

15       The prognosis for successful adjustment in the

16   community is excellent.  I went on then, and as I

17   indicated to you, I did review your disciplinary history

18   within the institution.  And we discussed that.  I also

19   found in February 23rd, 2006 there is a laudatory chrono

20   that you have completed Healing for the Angry Heart

21   video series.  I found another chrono dated for December

22   8th, 2005 that you completed a 12-week Anger Management

23   class that was conducted in the Protestant chapel.

24       And then I found a certificate for your

25   completion of the Anger Management program and another

1    certificate.  I should distinguish those two.  One is

2    dated February, 2006.  And the other was dated December

3    22nd, 2005, both for Anger Management.  And then there

4    was one dated October 1st, 2005 also for participation

5    in Anger Management.

6         And then I found a certificate for apparently

7    volunteering in a tutoring program.  It's the Volunteer

8    Tutor Workshop.  You did a 12-hour workshop with an

9    emphasis on tutoring and literacy.  And that is dated

10   June 7th, 2001.  That's actually before your last Board.

11   But I did see that.  And I wanted to bring that up.

12        And then I found a Set Free Prison Ministries

13   certificate that you have completed 32 units of study.

14   And that was in October of 2002.  And then there is a,

15   not really a certificate, but a document I should say,

16   from the University of California at Los Angeles that

17   certifies that you successfully participated in the Art

18   Search class called Creative Writing.  And you completed

19   that apparently in October 10th of 1996.

20        I found, and I think I may have mentioned this

21   chrono already, that, yes, I did.  This is the April

22   9th, 2007, the chrono from the Muslim chaplain when you

23   took the class, two-week seminar on how to become a

24   sober father and not get angry.  And then the Healing

25   Heart, I covered that.  I covered the Anger Management.

1    And I believe those were all of the laudatory chronos

2    that I could find going back at least to the early '90s.

3         I did not find, and I noted that the psychologist

4    in his report, let me just find that, one moment please.

5    I was unable to locate vocational certifications in this

6    file.  Do you have vocational certifications?

7         **INMATE STAICH:**  No, I don't have, not the ones

8    that I previously done before I became disabled.  I do

9    not have any verification other than the records to

10   where I have taken those, which are federal records, you

11   know --

12        **DEPUTY COMMISSIONER ALVORD:**  Okay.

13        **INMATE STAICH:**  -- that I don't have a copy of.

14   I tried to obtain them before I came in here.  But

15   getting through the bureaucracy and red tape of getting

16   a federal, you know, all these courses that I took when

17   I was young and that I was a certified mechanic in two

18   different areas, I wasn't able to obtain them.  So other

19   than what is documented in the file that you have read

20   is all we have to work with on that area.

21        **DEPUTY COMMISSIONER ALVORD:**  Okay.

22        **INMATE STAICH:**  But that is before the

23   disabilities had occurred.

24        **DEPUTY COMMISSIONER ALVORD:**  And that's what I

25   was looking for.  Is because when he mentioned that you

1  had vocational training in motorcycle repair, welding

2  and woodshop and I couldn't find that in here, but

3  obviously he had something that led him to believe that.

4       **INMATE STAICH:**  Yes.

5       **DEPUTY COMMISSIONER ALVORD:**  So apparently you

6  did have some training in the '80s.

7       **INMATE STAICH:**  Well the counselor verified this

8  before, when I first came into the system by contacting

9  the federal parole people that had my file.  So that's

10 how that got placed into the file.

11      **DEPUTY COMMISSIONER ALVORD:**  So those are

12 vocational trainings that you did, would have been

13 between 1978 probably and 1980.

14      **INMATE STAICH:**  That's correct.

15      **DEPUTY COMMISSIONER ALVORD:**  All right.

16      **INMATE STAICH:**  Actually 1982, up to 1982.

17      **DEPUTY COMMISSIONER ALVORD:**  Okay.  I thought you

18 were let free in '82.  But whatever it is, in the '80s.

19      **INMATE STAICH:**  Yeah, right there is when I got

20 out.  But that was before I got released.

21      **DEPUTY COMMISSIONER ALVORD:**  And those were

22 obviously vocational trainings that you obtained prior

23 to this life crime?

24      **INMATE STAICH:**  Prior to the injuries I've

25 sustained here and the disabilities, correct.

1    **DEPUTY COMMISSIONER ALVORD:** All right.  So am I

2  correct that since the life crime I didn't see any

3  vocational chronos.

4    **INMATE STAICH:** No.

5    **DEPUTY COMMISSIONER ALVORD:** All right.

6    **INMATE STAICH:** But I can explain that if you

7  would like.

8    **DEPUTY COMMISSIONER ALVORD:** Sure.  I just wanted

9  to make sure that I wasn't missing something in the

10  file.

11    **INMATE STAICH:** Okay.  Well when you come into

12  the prison system, you're assessed point scales.  And

13  for every year it's three points.  So any inmate that

14  comes in with a second degree murder, something in that

15  range right there, you're automatically going to be 45

16  points.  That inmate is going to be housed in a level

17  four housing.

18    Now the particular one that I was sent to was new

19  Folsom.  That prison right there, I mean, the first day

20  I was on the yard out there they had a riot, I mean,

21  just nothing but chaos, guys being shot, stabbed.  It

22  was just horrible to be in that environment.  But that

23  limits your access because the guards are more worried

24  about security and trying to take care of all the

25  problems inside the prison.  And inmates ain't getting

1   out to do anything.

2       It wasn't until I actually got to this prison

3   here that I've been able to do anything, you know, just

4   to be honest with you, because after that, when I

5   finally got level three points and went to Corcoran,

6   Corcoran isn't any better.  I mean, you guys know some

7   of the statistics on that place.  And you're never

8   getting out of your cell.

9       They got these north and south guys that just

10   every time they open up the doors, they go at each

11   other.  And the white guys just try to stay out of the

12   way.  So pretty much, you are very limited on what you

13   get to do inside the prison system.

14       And even at this prison here, which can be

15   verified through all the documentation is they have had

16   a lot of problems here with these inmates filing or

17   filling in the mailboxes kites that threaten the

18   officers.  And the officers have to protect themselves.

19   So they lock down the prison to investigate this.  This

20   goes on constantly.  It's maybe within the last six

21   months that we haven't had that problem in a while,

22   luckily.

23       But because this occurs inside the prison system,

24   there is nothing that we can do.  Our hands are tied,

25   the lifers.  We sit in here, you know, wanting to do as

1  much as we can.  I've gotten all these stress

2  management, I've done everything possible that I could

3  do within the boundaries of my limitations.  And the

4  problems that go on inside the prison, I mean, even

5  these guards that are in here know that this is

6  occurring all the time.

7       And so they have to protect themselves.  They

8  lock the prison down.  This goes on.  They have to

9  search every wing, go through everybody's property.

10  This takes, you know, maybe a month's time.  There is a

11  lot of people in here.  It's overcrowded.  So that's

12  part of the reason why we don't get much access to doing

13  things and being able to bring more to you guys that

14  would show that we're suitable for parole, you know, in

15  that particular area.

16       But that doesn't mean that I've been inactive as

17  far as doing things that are productive towards my

18  release into the community.  And I have other things

19  that I do that I wanted to show you here that go along

20  with that same line right here.  In the prison system I

21  have become an artist.

22       **DEPUTY COMMISSIONER ALVORD:**  If you will give

23  that to --

24       **INMATE STAICH:**  Yeah.

25       **DEPUTY COMMISSIONER ALVORD:**  -- correctional

43

1   staff, we will certainly take a look at that.

2        **INMATE STAICH:**  Okay.

3        **DEPUTY COMMISSIONER ALVORD:**  Anything you have

4   that indicates --

5        **INMATE STAICH:**  Yeah.

6        **DEPUTY COMMISSIONER ALVORD:**  -- that you have

7   done positive things, we definitely want to look at it.

8   I will tell you, sir, that I'm looking at --

9        **INMATE STAICH:**  Also --

10       **DEPUTY COMMISSIONER ALVORD:**  Go ahead.

11       **INMATE STAICH:**  I have a letter here for you that

12  was sent to me directly from the counselor.  And here is

13  her envelope that she sent it to me so it is in the file

14  somewhere indicating that I'm going to be working at as

15  a custom painter in a new business that is opening up in

16  the Riverside area.  And that I've already been working

17  with these people here.  I do a lot of patterns and

18  stuff for motorcycles, cars.  It's all custom stuff,

19  whatever they want done on there.  I do pin striping

20  work.

21       And I have a lot of talent when it comes to

22  artwork.  And so pretty much I haven't been inactive

23  just because, so I guess you can call me an autodidact,

24  which is a person that is self-taught.  So I have no

25  been completely inactive because of what the security

44

1  problems here in the prison.

2       And so I wanted you to know that, reflect that on

3  to the record, too, as well. A lot of things that we do

4  in here, you know, is stuff that we do in our cell area

5  that you guys really don't ever really get to know about

6  because they're not through the institution. They're

7  not sanctioned. And there is no chronos written on

8  them. So basically it's just stuff that you do in the

9  presence of your cell are on these long lockdowns.

10      **DEPUTY COMMISSIONER ALVORD:** I will say, sir,

11  that I have reviewed your classification. And I did

12  note that you reduced from 29 points down to double 2

13  points in 1995. And you have been that level since that

14  date.

15      **INMATE STAICH:** Yeah, also that it has been

16  mentioned by the Ninth Circuit in the Johnson Decision

17  that level two is the lowest position that an inmate can

18  get himself to inside the prison system. And the

19  inmates that stay in this environment right here are

20  considered non-violent as far as the prison setting is

21  concerned. They're not causing any problems with the

22  other inmates.

23      **DEPUTY COMMISSIONER ALVORD:** Right. We are well

24  aware of the override.

25      **INMATE STAICH:** Okay.

1      **DEPUTY COMMISSIONER ALVORD:**  Well aware, believe

2  me.

3      **INMATE STAICH:**  All right.

4      **DEPUTY COMMISSIONER ALVORD:**  All right.  Did I

5  miss anything, sir?

6      **INMATE STAICH:**  No.  That's all I wanted to bring

7  up on that area right there.

8      **DEPUTY COMMISSIONER ALVORD:**  All right.  That

9  being the case, we will turn it back over to the Chair.

10  Thank you.

11      **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.

12      **INMATE STAICH:**  Okay.

13      **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Staich, in

14  November, 1983 you were, excuse me, let's back up a

15  little bit.  Could you tell me what your parole plans

16  are right now in regards to residence?

17      **INMATE STAICH:**  I will be living with my fiancé.

18  And I also have a documentation in there that I can live

19  with my mother as well if you don't feel that's

20  suitable.  But --

21      **PRESIDING COMMISSIONER KUBOCHI:**  We don't make

22  those determinations.

23      **INMATE STAICH:**  I know there is two places there

24  that I could go.

25      **PRESIDING COMMISSIONER KUBOCHI:**  And that would

46

1  be Shelley Wood?

2          **INMATE STAICH:**  Yes.  And the other one is my

3  mother.

4          **PRESIDING COMMISSIONER KUBOCHI:**  Right.  I

5  remember seeing that.

6          **INMATE STAICH:**  So, yeah, so I have two

7  residences to go to, you know.  I realize you guys do

8  have a lot to do with Penal Code Section 3003, which has

9  all different areas on parole and special restrictions.

10  And the Board has the right to do stuff like that.  So I

11  only bring that up in that context right there.

12          **PRESIDING COMMISSIONER KUBOCHI:**  What city does

13  Ms. Wood live in today?

14          **INMATE STAICH:**  She lives in Mira Loma.

15          **PRESIDING COMMISSIONER KUBOCHI:**  And what does

16  she do for a living?

17          **INMATE STAICH:**  She works at Lowe's in the, she

18  works, well different areas, but basically she's in the

19  nursery.

20          **PRESIDING COMMISSIONER KUBOCHI:**  And how long has

21  she worked at that establishment?

22          **INMATE STAICH:**  It's brand new.  She just started

23  working there from her last employment.

24          **PRESIDING COMMISSIONER KUBOCHI:**  What type of

25  residence, does she rent or own?

47

1       **INMATE STAICH:**  She owns a double-wide mobile

2  home on a two-acre lot that's pretty large.  It's nice.

3  It's well equipped.

4       **PRESIDING COMMISSIONER KUBOCHI:**  Who else resides

5  with her?

6       **INMATE STAICH:**  She resides with her and her

7  daughter is living there right now with her new baby.

8       **PRESIDING COMMISSIONER KUBOCHI:**  And how old is

9  the daughter?

10       **INMATE STAICH:**  The daughter is 21 years old and

11  is engaged to be married and will be moving out soon

12  with her husband.

13       **PRESIDING COMMISSIONER KUBOCHI:**  And you have

14  indicated that your employment plans are to work in some

15  type of art-related field that may ultimately be

16  connected to vehicles?

17       **INMATE STAICH:**  Yeah, just auto spraying stuff

18  because I'm limited with what I can do as far as my

19  disabilities.  So that's something that is not really

20  too strenuous on the body as far as spray guns and

21  mixing paints.  You just have to have the right

22  apparatus, the breathing apparatus.  And I've studied up

23  on all this right here.  And I've done this before I

24  came in here.  My dad was an auto mechanic.  And he has

25  owned quite a few different little shops in that area

48

1    there.   So I've learned a lot about painting and how to

2    spray.

3         PRESIDING COMMISSIONER KUBOCHI:   You were 27 at

4    the time of the homicide?

5         INMATE STAICH:   Uh-hmm.

6         PRESIDING COMMISSIONER KUBOCHI:   And then you had

7    been sent to federal prison in what was that, '79?

8         INMATE STAICH:   In 1980.

9         PRESIDING COMMISSIONER KUBOCHI:   In 1980?  And so

10   that would have been, and then you had also this escape

11   in '77, you were in jail.  So the escape you were about

12   21 years old back in Riverside County?

13        INMATE STAICH:  ·Twenty.

14        PRESIDING COMMISSIONER KUBOCHI:   Twenty.   Then

15   you went to prison.  And then you later got this, you

16   later got this federal charge.  What periods were you

17   employed from the time of turning 20?

18        INMATE STAICH:   Anytime that I was released, I

19   worked the whole time at different, I either worked for

20   my father directly or I worked for Eddy's Tree Service

21   in Orange County.

22        PRESIDING COMMISSIONER KUBOCHI:   In 1983,

23   November specifically, when you were paroled on the

24   federal charge, what city were you paroled to?

25        INMATE STAICH:   I was paroled to Orange County.