# EXHIBIT 1
# part 2 of 2

1    I was staying at my brother-in-law's house in Silverado

2    Canyon.   That's where I was working when this crime

3    occurred.

4         PRESIDING COMMISSIONER KUBOCHI:   And then you,

5    when you were paroled, you contacted your federal parole

6    officer?

7         INMATE STAICH:   Yeah.

8         PRESIDING COMMISSIONER KUBOCHI:   And that would

9    have been in Orange County?

10        INMATE STAICH:   Actually I think they had me in,

11   because of my mother's residence, they had put me, but

12   they allowed me to live in Orange County because that's

13   where my employment was.

14        PRESIDING COMMISSIONER KUBOCHI:   Okay.

15        INMATE STAICH:   So the parole agent was out of

16   the, I think he was even further out than that because

17   they don't have the regions back then.   He was in San

18   Bernardino.

19        PRESIDING COMMISSIONER KUBOCHI:   By my

20   mathematics, and tell me if I'm wrong, is the murder

21   happened about a month after you were paroled?

22        INMATE STAICH:   Twenty-one days.

23        PRESIDING COMMISSIONER KUBOCHI:   Twenty-one days.

24   And how did you find out where Cynthia was living?

25        INMATE STAICH:   My brother saw her at a gas

1  station about a week before that.  And he had testified

2  this to the trial.  It's part of the transcripts.  That

3  she told him that we were still engaged to be married at

4  that time and that the relationship was still going.

5       **PRESIDING COMMISSIONER KUBOCHI:**  Now I just want

6  to ask you a real simple question, would you have been

7  in violation of parole if your parole officer knew that

8  you had went to where Ms. Bess was living once you were

9  paroled in November of '83?

10      **INMATE STAICH:**  Well probably yes, but there is a

11 little bit of a question here.  He testified at the

12 trial that when he saw me and interviewed me, I asked

13 him about my fiancé at the time.  And he told me that he

14 didn't want me to go around her.  He wasn't ordering me

15 not to.  But he told me he didn't want me to go around

16 her.  And he wouldn't tell me anything else.  And she

17 had my car, all my clothes, everything.  A lot of my

18 stuff was with her.  So plus I was young, you know.

19      **PRESIDING COMMISSIONER KUBOCHI:**  This was all

20 covered in your trial.  But why did you --

21      **INMATE STAICH:**  Yeah.

22      **PRESIDING COMMISSIONER KUBOCHI:**  -- go over

23 there?  What time did you go over there to that

24 grandparent's place?

25      **INMATE STAICH:**  I went over there at, well I

*Capitol Electronic Reporting*

1   lived up in the mountains.  So it took about, I left

2   after work and everything and cleaning up and

3   everything.  We don't get done until about 10 o'clock

4   and put all the stuff back in the sheds.  And so it was

5   probably approximately 11 o'clock when I took off.  And

6   I didn't get over there until 12 o'clock at night.

7           PRESIDING COMMISSIONER KUBOCHI:   Twelve p.m.?

8           INMATE STAICH:   Yeah.

9           PRESIDING COMMISSIONER KUBOCHI:   Twelve a.m.  And

10  then who was your employer?

11          INMATE STAICH:   Eddy.

12          PRESIDING COMMISSIONER KUBOCHI:   Ed?

13          INMATE STAICH:   Bill Eddy.

14          PRESIDING COMMISSIONER KUBOCHI:   Bill Edny?  And

15  that was --

16          INMATE STAICH:   Eddy's Tree Service.

17          PRESIDING COMMISSIONER KUBOCHI:   Edny's Tree

18  Service?

19          INMATE STAICH:   Yeah, E-D-D-Y.

20          PRESIDING COMMISSIONER KUBOCHI:   E-D-D-Y, oh,

21  Eddy's Tree Service.

22          INMATE STAICH:   Yeah, Eddy's Tree Service.

23          PRESIDING COMMISSIONER KUBOCHI:   Okay.  And what

24  county was that?

25          INMATE STAICH:   That's Orange County in Silverado

1    Canyon.

2        **PRESIDING COMMISSIONER KUBOCHI:**  And you claim

3    that you worked on the day of December 7th, 1983?

4        **INMATE STAICH:**  That's correct.

5        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  And as

6    far as you knew, Eddy's Tree Service was a business that

7    was in the yellow pages and --

8        **INMATE STAICH:**  It is in the yellow pages.

9    They're contracted with the city of Orange County to do

10   all the high wire, when the winds blow, the Santa Ana

11   winds down there and the trees get all caught up in

12   there.  The city contacts them to do most of their major

13   work for removing trees and hot wires.

14       **PRESIDING COMMISSIONER KUBOCHI:**  And what was

15   your reason in kicking, cutting the phone wires?

16       **INMATE STAICH:**  Because I never got along before,

17   the grandparents didn't like me because I had long hair.

18       **PRESIDING COMMISSIONER KUBOCHI:**  Well how old

19   were they?

20       **INMATE STAICH:**  Probably in their 60s.

21       **PRESIDING COMMISSIONER KUBOCHI:**  Couldn't have

22   been much of a threat to you as a 27 year old man, could

23   they?

24       **INMATE STAICH:**  They weren't no threat to me at

25   all.  But they didn't want me associating with her.

1    PRESIDING COMMISSIONER KUBOCHI:  And then why did

2 you kick in the door?

3    INMATE STAICH:  Well as part of the transcripts

4 show that, me and that man had an argument at the door.

5 I rang the doorbell.

6    PRESIDING COMMISSIONER KUBOCHI:  You and the

7 grandfather?

8    INMATE STAICH:  No, I didn't have nothing to do

9 with the grandfather.  There is none of that in there.

10    PRESIDING COMMISSIONER KUBOCHI:  You and

11 Mr. Topper?

12    INMATE STAICH:  Me and Mr. Topper had an argument

13 at the front door.  That's when I found out.  I didn't

14 even know he was over there.

15    PRESIDING COMMISSIONER KUBOCHI:  And what was

16 your reason in having a hammer at the door after you,

17 because you kicked it in, what was your reasoning for

18 having a hammer?

19    INMATE STAICH:  The only reason I took a small

20 hammer with me is because I used it to pull the phone

21 line off the wall.  They got little metal brackets that

22 fit into the wall.  It holds a phone line down.  I used

23 the back of the claw hammer and pulled the wire loose

24 from the wall.  But they don't talk about it, I had

25 black electrical tape with me, too, in my truck to put

1    the wires back together.  I thought that maybe after I

2    went to the door and everything that she would come and

3    answer it.  And we would talk.  And I would get my

4    little bit of property or whatever, everything would

5    have went smooth.  But it didn't work out that way

6    unfortunately.

7        PRESIDING COMMISSIONER KUBOCHI:  Well isn't it

8    unexpected to not be smooth when you kick in somebody's

9    door at 12 a.m.?

10       INMATE STAICH:  But you're not taking into

11   consideration that me and him argued at the door before

12   the door got kicked in.  There was a verbal

13   confrontation back and forth where he threatened me.

14       PRESIDING COMMISSIONER KUBOCHI:  Well wouldn't it

15   be pretty foreseeable that if somebody kicked in your

16   door at 12 a.m., you would respond and be a little upset

17   at whoever was at the front door, who kicked it in?

18       INMATE STAICH:  Yeah, but if you were engaged to

19   be married to somebody that was living in that house and

20   you had not had any information from that party that

21   they were severing that relationship with you --

22       PRESIDING COMMISSIONER KUBOCHI:  No, I'm putting

23   you on the guy who responded to the door.  You're the

24   guy at the door.

25       INMATE STAICH:  I'm at the door and he is at the

1    door.   Okay.   But you got to look at the reasoning why

2    an individual went to the door to begin with and what he

3    was doing.

4         **PRESIDING COMMISSIONER KUBOCHI:**   Do you think

5    that the homeowner had, and you're the guy at the door

6    now --

7         **INMATE STAICH:**   Well I'm going to tell you this,

8    and they changed the law in 1984.   Up until then the law

9    stated that the homeowner had to show just cause to use

10   aggressive force against anybody that broke into the

11   home.   That was later changed in a 1984 amendment.   But

12   this crime happened in '83.   So the law that would apply

13   at that time, the homeowner had to show that I was

14   trying to harm him.

15        Now, if he, if you want to say because the door

16   got kicked in, that doesn't mean I was going to harm

17   him.   He threatened me through the door.   He had the

18   gun.   I didn't have no gun.   And it should be taken into

19   consideration that my brother-in-law at the tree service

20   in the room that I was staying in, that they found this

21   out later, that he is a bear hunter and that he had over

22   30 guns in that room loaded.   There was handguns and

23   everything in the same area where I was staying at that

24   house.

25        All this evidence came out at the trial.   I

1  wasn't planning on harming anybody that night.  I didn't

2  have any, you know, sure there is stuff in there like I

3  had said I would talk about anything that was in there

4  as far as the second degree murder is concerned.  But

5  you know, I didn't know that guy had a loaded 357

6  magnum.

7          PRESIDING COMMISSIONER KUBOCHI:  Well if you --

8          INMATE STAICH:  It came out that he had been

9  shooting it at the range.  Why are you out shooting a

10  gun at the range and getting ready for somebody?

11          PRESIDING COMMISSIONER KUBOCHI:  If you, if

12  you --

13          INMATE STAICH:  He did a lot of things, too, that

14  led up to the situation.

15          PRESIDING COMMISSIONER KUBOCHI:  If you --

16          INMATE STAICH:  I'm not saying that I'm not

17  remorseful.  I'm very remorseful.  This should have

18  never happened.

19          PRESIDING COMMISSIONER KUBOCHI:  Well tell us

20  about your remorse then.

21          INMATE STAICH:  I am remorseful.  And I have

22  insight into this crime.  And it's a sad situation that

23  this man had to die.  Nobody should die over a

24  relationship with a female.  But I can't take back time.

25  It has been almost 25 years I've been in here, you know.

1   I'm very remorseful for this.  If there is anything I

2   could do to make that person's family or anybody better

3   off, if there are any way when I get into the community

4   and I start making a lot of money that I could do

5   something to some type of victim's rights group to help

6   out so this never occurs again, I would do it.

7       **PRESIDING COMMISSIONER KUBOCHI:**  One final

8   question.  If you went over there not to intend any

9   harm, got in an argument, why didn't you just leave?

10      **INMATE STAICH:**  And that's the key question.  Why

11  didn't I leave?  Okay.  And that's where the passion

12  comes in.  I was so in love with this woman.  She sent

13  photographs to me the whole time I was incarcerated.

14  This all came out at the trial.  She sent nude

15  photographs, stating and professing her love for me.

16      I had already been with this woman, had a sexual

17  relationship with her before I was incarcerated.  So as

18  far as I was knowing that at the time, that this woman

19  wanted to be with me and that he was the intruder.  And

20  she didn't really want to be with him.  You know, so I

21  didn't really, you know, I had a lot of emotions.  And I

22  was young.  I made a mistake.

23      I shouldn't have kicked the door open.  But after

24  I kicked the door open, he made another statement that

25  I'm down.  And that's when I entered into the home.  He

1    goes I'm down here.  And when I went down there, he

2    didn't pull a bible on me.  He came right around the

3    corner and he opened fire.  He blew this finger off

4    first.  That's a defensive wound that I had to block the

5    gun like that.

6        PRESIDING COMMISSIONER KUBOCHI:  Clarify one

7    thing for me.  Where were you when that first shot was

8    fired?

9        INMATE STAICH:  I was in the hallway, at the very

10   end of the hallway where he had called me that he was

11   down there.

12       PRESIDING COMMISSIONER KUBOCHI:  Okay.

13       INMATE STAICH:  So he is luring me deep into the

14   house.  Okay.  So I went down there.  And when I got

15   down there, he came right around the corner.  And he

16   fired.  He didn't say one word to me.  And I just went

17   like that, the natural reaction, and the finger was

18   blown off.  Blood, meat, everything went into my face.

19   The next thing I know he shoots again.  He catches me in

20   this arm.  Okay.

21       Out of a natural reaction, yeah I had the hammer

22   in my back pocket.  I pulled the hammer out of my

23   pocket.  And I started waling on him, everything I could

24   do to save my life because this man was trying to kill

25   me.  And I pushed him.  And we fought through that whole

1  time.

2      And the hammer slipped out of the thing, which

3  came in part of the trial, the hammer flew out.  So I

4  had nothing.  And he still got control of the gun.  And

5  we're fighting.  During that whole wrestling match is

6  when that gun went off.  And then the third one, another

7  one went through and just barely skinned between the

8  middle of my legs, which they showed bruising and

9  everything.  So I was barely missed by another round

10 during the wrestling match when the gun went off.

11      He was never, this whole, every wound that he

12 sustained was during the wrestling match with me during

13 this whole confrontation.  After that, I was in such a

14 state of shock because first of all, this vein is blown

15 open, your main artery.  And there is blood squirting

16 out everywhere.  You know, I feel like I'm dying.  A

17 bullet just went through my chest.  My lungs collapsed.

18      And I come around the corner and come down and

19 there she is waiting with a, she had a pistol, a starter

20 pistol.  And instead of just telling me to get out of

21 there or whatever, she fires at me.  Unbeknownst to me,

22 it's a zephyr starter pistol, some kind of a, for

23 scaring birds.  But it shot a flame out the end of it.

24      So I thought she was shooting me in the face or

25 you know.  And I just reacted to it.  And I reacted

1    wrong and I took the but of the gun after the wrestling

2    match with him, I got the gun.  I was running out just

3    to get rid of it.  And that's when I waled on her.

4    There is no excuse for it.

5             PRESIDING COMMISSIONER KUBOCHI:  And then what

6    happened next?

7             INMATE STAICH:  She fell down in the kitchen.  I

8    obtained the gun that she was firing.  And I just tried

9    to go get help.  I was in shock.  I was bleeding.  I

10   mean, I don't know if you guys can understand that.  But

11   you know, that's what happened.

12            PRESIDING COMMISSIONER KUBOCHI:  Now after all of

13   this was done, what property was returned to you?

14            INMATE STAICH:  From this whole situation,

15   nothing.

16            PRESIDING COMMISSIONER KUBOCHI:  Nothing, okay.

17            INMATE STAICH:  I got a life sentence for it.

18   And I've been in here 25 years.

19            PRESIDING COMMISSIONER KUBOCHI:  Okay.

20            INMATE STAICH:  A very bad mistake on my part,

21   you know.

22            PRESIDING COMMISSIONER KUBOCHI:  Okay.

23            INMATE STAICH:  But I can't change what has

24   occurred.  And I'm very remorseful for it happening.

25   And I wish it never did happen.

1          **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Thank

2     you.  Commissioner, do you have any questions?

3          **DEPUTY COMMISSIONER ALVORD:**  Just two that I

4     wanted to make sure that I have clarification on the

5     record.  Since '78, that's when you went and did two

6     years for the escape, correct?

7          **INMATE STAICH:**  Uh-hmm.

8          **DEPUTY COMMISSIONER ALVORD:**  Then you were out

9     six months on parole.  And then you were revoked for the

10    threats.  Then you went back into custody.  You were

11    released in the first part of 1980.  And then you went

12    into the federal system.  So it appears to me that

13    between 1978, I'm sorry, I left out this, the life

14    crime.  You were paroled then in 1983 from the federal

15    system.  And 23 days later the life crime occurs.  So

16    from '78 to '83 it appears you were only loose or on the

17    streets for six months.

18          **INMATE STAICH:**  That's probably a correct

19    prognosis there.

20          **DEPUTY COMMISSIONER ALVORD:**  Okay.  And that's

21    the time period when you were doing the motorcycle

22    mechanic and the landscaping?

23          **INMATE STAICH:**  Whatever, yeah, I never really

24    got to really utilize all that, you know, because of the

25    problems I had with the, you know, look guys.  I didn't

1  know this was going to happen.

2      **DEPUTY COMMISSIONER ALVORD:**  Of course.

3      **INMATE STAICH:**  I'm just being honest with you.

4      **DEPUTY COMMISSIONER ALVORD:**  And the other

5  question I simply had is I'm not sure that I fully

6  understand why you were at the house at midnight.

7      **INMATE STAICH:**  And as I told him, I was working

8  at the time.  And we didn't get the yard cleaned up

9  until 10 o'clock.  It's a tree business, chainsaws,

10  climbing ropes, all those apparatus.

11      **DEPUTY COMMISSIONER ALVORD:**  Sure, but there are

12  other days.

13      **INMATE STAICH:**  What?

14      **DEPUTY COMMISSIONER ALVORD:**  There are other

15  days.  That's what I don't understand, frankly, is it

16  didn't have to be that day.  Midnight is a strange

17  hour --

18      **INMATE STAICH:**  I know.  I understand that.

19      **DEPUTY COMMISSIONER ALVORD:**  No, no.  Let me

20  finish.

21      **INMATE STAICH:**  Okay.

22      **DEPUTY COMMISSIONER ALVORD:**  Midnight is a very

23  strange hour to go calling.  And I was wondering why you

24  chose to go that late.

25      **INMATE STAICH:**  Okay.  Here is another thing,

1    too, is my fiancé at that time that is the victim in

2    this crime worked graveyard shift at the Roadrunner

3    Restaurant.  And she stayed up on those days that were

4    off.  And according to what my brother told me, those

5    were her days off.  So she is a graveyard shift worker,

6    though, you know, that's still not an excuse for what

7    happened.  But that's part of the reasoning why I went

8    late at night is because that's when her days are off

9    and she is up all night because she sleeps during the

10    day.

11              **DEPUTY COMMISSIONER ALVORD:**  Okay.  That's all I

12    had.

13              **PRESIDING COMMISSIONER KUBOCHI:**  Well I have one

14    question.  Your trial transcript indicates that there

15    were 67 collect calls to Bess' father in July and August

16    of '83 in an attempt to locate her.  Okay.  That's in

17    your Appellate transcript.  Didn't the 67 calls kind of

18    tell you that she didn't want to be in the relationship

19    anymore when none of that, none of those calls resulted

20    in affirmative response by her?

21              **INMATE STAICH:**  Well when you're having a sexual

22    relationship with someone and you're still receiving

23    mail inside the prison up through those calls right

24    there and she tells me that I can contact her at her

25    father's house, and those letters are part of the

64

1  evidence in the trial, I think there is mitigating

2  factors there on that issue right there, Sir.

3          **PRESIDING COMMISSIONER KUBOCHI:** Okay. Thank

4  you. At this time, sir, we are going to have closing

5  statements by the District Attorney's representative

6  followed by your opportunity to tell us why you believe

7  you are suitable for parole at this time.

8          **INMATE STAICH:** Okay.

9          **PRESIDING COMMISSIONER KUBOCHI:** Mr. Lockhart?

10         **DEPUTY DISTRICT ATTORNEY LOCKHART:** Thank you.

11 The circumstances of this crime do not warrant release.

12 The simple fact is I'm not saying that the inmate

13 intended to shoot Mr. Topper when he went over there.

14 However, something was going to go down. It indicates

15 planning and calculation. He armed himself with a

16 hammer. It was in the middle of the night. We have

17 been discussing these at great, well, the Board has been

18 discussing these at great length in the last several

19 minutes.

20         He cut the phone wires, broke the door down,

21 attacked his ex-girlfriend and her husband. What I find

22 interesting is there seems to be so many, just in the

23 last couple of minutes that the inmate has been talking

24 about the crime, it just seems that there was so many

25 times when this crime could have been averted.

 1          What just jumped out in my head about 90 seconds

 2     ago is when he said she worked graveyards at this

 3     restaurant.  Well if he just wanted to get his property

 4     back and you know, kind of resolve things, why not go to

 5     the restaurant during one her graveyard shifts at a

 6     neutral site when he knows that he is not gaining access

 7     to this girl through her grandfather as the 67

 8     unanswered phone calls indicate.  Why not go to this

 9     neutral location?

10          The crime indicates overkill, the multiple blows

11     to the husband's head.  He was shot three times

12     including once in the back.  There was brain damage to

13     his ex-girlfriend because of the multiple blows.  It

14     seems that the motive for the crime is extremely

15     trivial.  He was obsessed with this woman.  He was

16     stalking her.  He threatened her.  He threatened her

17     husband.

18          The file indicates that he had called Robert

19     Topper.  He knew, the inmate knew that Robert Topper was

20     in the picture.  He had called him and threatened him as

21     well.  It's obvious that the inmate has longstanding

22     issues with women given the many times he has threatened

23     women including the woman for which he, the woman he

24     threatened for which he was serving the federal

25     commitment.  And even after he was committed for this

1    crime in 1996 he threatened his ex-wife as well.

2         Moreover, the prior grants of parole and

3    probation have been failures for the inmate.  He was on

4    that federal parole for the crime that I just talked

5    about when he began his obsession with Cynthia Bess.

6    That parole was revoked because of his obsessive and

7    threatening behavior.  And he was paroled again with the

8    promise, the file indicates, that he would stay away

9    from Cynthia Bess.

10        In other words, he was ordered by as a condition

11   of parole to stay away from her, which is why he told

12   the Board that it would have been a violation of his

13   parole to even go and talk to her.  Obviously, he did

14   not obey that promise when he committed the instant or

15   excuse me, the commitment offense while on parole.

16        There is a huge, the inmate says he has insight.

17   I would respectfully disagree.  I think there is a huge

18   lack of insight and a lack of acceptance of

19   responsibility.  When I was reviewing the file last

20   night, as the Board knows, I wasn't planning on doing

21   this hearing.  So I reviewed the file last night.  The

22   2006 Board report says, which is the most current Board

23   report, says that the inmate's version of the crime is

24   the same as in the last Board report, which was the 2002

25   report.

1          And in that 2002 report the inmate is quoted as

2    saying that his case is quote, not egregious due to the

3    fact that he was found guilty of second degree murder

4    and the fact that Robert Topper was the original

5    aggressor by firing the weapon at the inmate.  He also

6    said that Cynthia was in possession of a handgun and

7    fired two rounds at the inmate before he defended

8    himself against her aggressive assault.

9          The inmate stalks this woman, breaks into her

10   house in the middle of the night, kills her husband and

11   suddenly she is the aggressor.  He says today that he

12   didn't know that she didn't want him.  And as the Board

13   astutely questioned the inmate, how could those 67 phone

14   calls not indicate that she didn't want him.  How could

15   the fact that she's the one that called his parole

16   officer, his federal parole officer in 1983, and it was

17   that call where she said, I'm being threatened by the

18   inmate and he had threatened Robert Topper by that

19   point.  And therefore his federal parole was revoked

20   because she ratted him out for what was going on at the

21   halfway house.

22          So I don't understand how, there is a huge chasm

23   of understanding, at least from my perspective, where I

24   don't get how he can say I didn't understand that she

25   didn't want to be with me.  She is getting his parole

68

1   revoked.  She is ignoring 67 phone calls.  And then

2   suddenly because they are, when he breaks down the door,

3   cuts the phone wires, and they are defending themselves

4   and their property, suddenly they are the aggressors.  I

5   mean, how can the inmate under these facts of this crime

6   claim the mantle of victim-hood?  I mean, it's kind of

7   outrageous.

8        Moreover, the Board talked about the, I think

9   this was Deputy Commissioner Alvord, talked about the

10  psychological evaluations and the huge difference

11  between the 2002 psych evaluation and the 2006.  I don't

12  understand what was wrong with Dr. Gamard's assessment

13  that the inmate is possessive of women and that he does,

14  he becomes jealous when they're with someone else.  I

15  don't understand how the facts of the long sordid

16  history of this case do not support that assessment.

17       The 2006 evaluation by Dr. McComber is

18  problematic for a number of reasons.  Number one, how

19  can anyone say that a convicted murderer is no more

20  likely to be violent than any other member of society?

21  That is a ridiculous statement.  Number two,

22  Dr. McComber uses no critical analysis and accepts what

23  the inmate tells him as gospel.  And I wonder why.

24       He claims that the inmate's prognosis for

25  successful adjustment is excellent.  However, he accepts

1  the inmate's version of what happened in spite of what

2  the record of the case is.  Dr. McComber talks about the

3  inmate, quote, trying to set the record straight and

4  tell a story.  But no questions are asked by

5  Dr. McComber, no discussion of how the inmate's version

6  is not supported by the evidence.

7       Dr. Gamard, on the other hand has an opposite

8  assessment.  This evaluator is critical of the inmate's

9  version of the events.  He says that the inmate's

10  potential for violence is high.  What has changed about

11  the inmate between 2002 and 2006 to warrant

12  Dr. McComber's change from Dr. Gamard's opinion.  And

13  that is nothing.

14       One doctor, Dr. McComber, believes the inmate

15  hook, line and sinker.  And the other, Dr. Gamard, is

16  rightfully skeptical of what the inmate is telling him.

17  For all the reasons stated, for the, especially for the

18  fact that there seems to be a disconnect between the

19  objective facts of this case and what the inmate says

20  occurred showing a lack of insight into the crime, for

21  all those reasons, the inmate is not suitable for parole

22  and would be an unreasonable risk to the community.  And

23  I would urge the Board to deny him a parole date at this

24  time.  Thank you.

25       **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.

1   Mr. Staich, before giving your statement, you are not

2   obligated to respond to anything the DA says.  As I

3   indicated at the outset, this is not an adversarial

4   proceeding.  We are not here to retry your guilt or

5   innocence.  We are here to gather facts as to why you

6   are suitable for parole.

7        And I want you to address us and tell us why you

8   are suitable for parole.  Not responding to anything the

9   DA says is not held against you because you are

10  representing yourself.  And we want to hear why you

11  believe you are suitable for parole.

12       **INMATE STAICH:**  Well not objecting on the record

13  to something leaves the record without any objection,

14  you know.  And --

15       **PRESIDING COMMISSIONER KUBOCHI:**  No, you can make

16  your record.

17       **INMATE STAICH:**  I just can't go like that because

18  everything he is stating right there goes totally

19  against what I'm about.

20       **PRESIDING COMMISSIONER KUBOCHI:**  You can make

21  your record.  But then in telling us why you believe you

22  are suitable for parole, there is no need to respond to

23  what he says.

24       **INMATE STAICH:**  That's fine.  If you don't want

25  me to, I won't.

1          **PRESIDING COMMISSIONER KUBOCHI:**  No, I'm not

2    saying --

3          **INMATE STAICH:**  You're conducting this.

4          **PRESIDING COMMISSIONER KUBOCHI:**  I'm not saying I

5    don't want you to.  I'm just saying don't feel

6    obligated.  You could make your record because you're

7    representing yourself.

8          **INMATE STAICH:**  Yeah.

9          **PRESIDING COMMISSIONER KUBOCHI:**  You make your

10   record and then you go on to tell us why you believe you

11   are suitable for parole.  This is not a retrial.  This

12   is not a judicial proceeding.

13         **INMATE STAICH:**  Yeah, I understand that.  And

14   that's why I put in an objection to begin with under

15   2030 of the Title 15, Division Two to his presence in

16   here because this is a boiler plate statement that comes

17   from every District Attorney on anybody convicted of

18   murder.  They do this every time.  It's nothing but a

19   pro form of hearing to them.  It's a sub rosa.  They're

20   involved in this constantly.

21         They're probably taught or go through some kind

22   of course to learn to go after the inmates, make all

23   these adverse statements against them regardless of the

24   amount of time that has been served and the

25   accomplishments by the inmate inside the prison.  And I

1    will leave it at that on that issue.

2         **PRESIDING COMMISSIONER KUBOCHI:**  Yes.  Thank you

3    very much.

4         **INMATE STAICH:**  Okay.  All right.  Now as far as

5    me being suitable for parole, I feel that I have

6    accomplished a lot on my own with my disabilities, what

7    I could do in this environment.  I've been in prison for

8    25 years.  You have made a lot of statements on the

9    record here that I have never really been a part of the

10   community for very long.  So I've never really had a

11   chance to be a productive citizen because when I was

12   young I got involved with women.  And things didn't go

13   the right way.  And it led to this.  So that's where

14   we're at right now.

15        But during all these years, you know, there is

16   insight into this crime whether anyone wants to believe

17   it or not.  I know it's wrong.  It should have never

18   occurred.  You know, it's just so hard when you're that

19   young at the time and you just don't see things when you

20   get older that you would see when you're younger.  And

21   on that aspect right there I still think I'm suitable,

22   that I could be a productive citizen in the community.

23   I have a lot of good qualities about me.

24        Other than this crime right here I have no prior

25   violence inside the prison system.  I've conducted

1  myself with respect.  I give all the officers in the
2  prison respect.  And they give me respect back.  I've
3  never had any problems with anybody.  I've been in this
4  prison for several years.  And I obey the rules to the
5  best of my ability with the exception of the one where
6  I'm a Nazarite.  And I do have religious beliefs that
7  have conflicted with the system a little bit.  But other
8  than that I've caused no major disturbances.
9      I think that I've earned my parole after nearly
10  25 years in here.  This was a crime that occurred when a
11  person was very young.  And the other person was young.
12  And I made a lot of wrong decisions that you have
13  brought out on the record.  You can't change those
14  things.  They happened.  They occurred.  They're
15  history, not that we are going to leave them in the past
16  and not reflect upon them to make our self better in the
17  future.  That's what we do when we do things wrong.  We
18  look at the wrongs and we have to evaluate the future so
19  that we don't have this happen again.
20      My fiancé now is 50 something years old, you
21  know, close to my age.  And she doesn't take drugs like
22  any of these other women I've been involved with.  She's
23  a productive citizen in the community.  She works at the
24  animal shelter as well.  She takes in stray animals that
25  are going to be, you know, euthanized.  She does a lot

1   of things, everything that she can.  And I just want to

2   go out there and try to be a part of that and help her

3   in her life and get on with mine and be a good,

4   productive citizen in the community and do everything I

5   can to help people.

6        I never wanted to turn out this way.  And I

7   wasn't born to be some kind of a killer.  And I never

8   wanted to kill nobody that night.  I don't know what

9   happened after that man shot me.  Yes, I made a big

10  mistake cutting the phone line, kicking the door open

11  and confronting the situation that way.  I was young.

12  Before all these injuries happened, I used to be a

13  weightlifter and I was real big.  You know, but I've had

14  a lot of damage to my body.

15       And I've learned, you know, that being that kind

16  of an aggressive individual is not the way that you get

17  through in life.  You just can't do that.  You don't use

18  physical violence or anything like that.  And I think

19  these 25 years have shown that, that I do have remorse

20  in me and that I don't want to hurt people or do

21  anything bad to anyone.

22       I haven't touched any person in this prison

23  system.  Remember I'm living amongst all kinds of gangs,

24  every kind of corruption you can think that is going on

25  in here, gambling and everything else.  And it goes on

73

1  in all these prisons. I've kept myself away from all of

2  it. I don't take drugs. I don't do anything wrong at

3  all. I just do my artwork that I've showed you there.

4  And I mind my own business.

5       I've seen several cases, though I realize this is

6  me, where the same situation has occurred where the

7  District Attorney is opposed and other people. And

8  these crimes, you know, not to say that my crime is not

9  a bad crime, it is, but when you see other people out on

10 the streets that only served 20 years and they took an

11 armed, you know, they had a machine gun and shot a man

12 10 times.

13      This Rosenkrantz case where he is free now

14 because his father is a big trial attorney. He has a

15 lot of money behind him. He spent over a million

16 dollars on his different writs throughout the courts.

17 There is five different Rosenkrantz decisions, I mean,

18 just hundreds and hundreds of hours of people being

19 involved in this including Board members that have had

20 to make statements and depositions to different Attorney

21 Generals based on the case.

22      I mean, there is just so much effort that goes in

23 that opposes these things, but in the end, even inmates

24 like that have been released back into the community.

25 And he has been doing fine out there. And this man went

1    to a shooting range a week before, fired that gun, did

2    everything he could to plan this murder.  But he's

3    walking the streets right now.  And he's doing good out

4    there from what I understand.

5         I'm just showing you that there is other people

6    that have committed these kinds of crimes that are back

7    in the community.  Another one is an Asian man that went

8    into a restaurant here, Mr. Lee, and had a problem with

9    the guy because he wouldn't pay him for his restaurant.

10   He opened fire in there and one of the bullets went

11   through the owner of the restaurant's wife's head,

12   killing her instantly.  He shot a couple of people in

13   there, too, as well.  He had attempted murders, guns,

14   all kinds of stuff.  This man was released back into the

15   community.

16        Now they have made some interesting

17   determinations in here as far as the law in being

18   suitable to the parole issues as far as some evidence is

19   concerned.  And basically what they're saying is the sum

20   evidence has to be something that was received or it's

21   part of what you have done in here that would reflect

22   that you're a threat to the community now.

23        I mean, we can go back into the crime that the

24   District Attorney has expressed his views about here.

25   And we can find all kinds of little things to tear it

1    apart and make me look like the big bad guy again.

2    Whether you consider that a retrial or not, it's still,

3    that's the same type of evidence that was put on at the

4    trial by the prosecution.  So, I mean, this can just go

5    on forever.

6         And we can spend millions of dollars on

7    taxpayers' money and having these hearings or we can let

8    a guy that's not a threat to the community get on with

9    his life.  It's costing taxpayers 53,000 dollars a year

10   for us to be in here.  The lifers are getting older.

11   There is lots of us in here.  The medical, you know, I

12   need all kinds of surgeries right now.  You know, it's

13   going to cost thousands of dollars.

14        I would rather go out in the community with my

15   artwork and make money and pay for my own stuff.  Why

16   should the taxpayers have to keep paying for me?

17   Everybody knows it's overcrowded.  They're trying all

18   these ways to effectively fix it.  There is hardly any,

19   you can't go to anything here, even these Anger

20   Management classes.

21        If I had a camera and took pictures, the lifers

22   are just stuffed in there.  It's hot.  You go through a

23   lot sitting in there.  But I went through all this

24   because that's what the last Board asked me to do.  I've

25   done everything that I could possibly do to show respect

1   for that Board and what they asked me to do.

2       And I'm not taking away that this crime was

3   committed by saying I done that.  I'm not trading that

4   for what I did.  What I did was what I did.  And it was

5   wrong.  And it's never going to occur again.  I can tell

6   you that.  Whether you keep me in here or not, I'm still

7   going to be a good person inside this prison or out on

8   the streets.  So I will leave it at that.

9       **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very

10  much, sir.  It is now 2:27.  We're going to be in

11  recess.

12      **DEPUTY COMMISSIONER ALVORD:**  And we are off the

13  record.

14                      **R E C E S S**

15                      --oOo--

16

17

18

19

20

21

22

23

24

25

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3        **DEPUTY COMMISSIONER ALVORD:**  Okay.  We're back on

4    the record.  The time is 3:12.

5        **PRESIDING COMMISSIONER KUBOCHI:**  We're back on

6    record on the Subsequent Parole Consideration Hearing of

7    Ivan Staich.  And Mr. Staich, I want to advise you that

8    we reviewed all information received from the public.

9    And before giving our decision I want you to know that

10   we seriously considered all the facts that you have told

11   us.  And in reviewing Section 2281, I think it's

12   informative in regard to the factors that we consider

13   because you have repeatedly indicated the static nature

14   of the crime that happened in 1983.  And you are correct

15   in that those facts could never change.

16        And it has been many, many years since your

17   commitment to state prison.  And I'm sure that that time

18   has weighed heavily on you.  And Section 2281 talks

19   about and describes determination of suitability in

20   Subdivision A it says, regardless of the length of time

21   served, a life prisoner shall be found unsuitable for

22   and denied parole if, in the judgment of the Panel, the

23   prisoner will pose an unreasonable risk of danger to

24   society if released from prison.

25   **IVAN STAICH      E-10079      DECISION PAGE 1      5/9-10/07**

*Capitol Electronic Reporting*

1          Subdivision B talks about information considered.

2   And we have honored all of your objections.  And we

3   believe that we have only relied on relevant, reliable

4   information.  And that in looking at the information

5   considered the ending sentence of that paragraph says

6   that circumstances, which taken along may not firmly

7   establish unsuitability for parole, may contribute to a

8   pattern which results in a finding of unsuitability.

9          And Subdivision C lists factors in a specifically

10  designated circumstances tending to show unsuitability.

11  And before getting into that Section and all the

12  subdivisions under Subdivision C or subsections,

13  Subdivision D is entitled Circumstances Tending to Show

14  Suitability.  And we have, you have talked about how

15  many years have gone by and how since 2001 you have not

16  had a 115.  And institutional behavior is but one of

17  eight factors listed, in fact, circumstances tending to

18  show suitability.

19         But even in looking at the institutional behavior

20  there have been 115s as recently as 2001.  Albeit you

21  have explanations for that because they were a series of

22  115s, the most recent of which was in 2001 for grooming

23  violations that this Panel is aware of federal

24  decisions.  But at the time of those 115s the

25  **IVAN STAICH      E-10079      DECISION PAGE 2      5/9-10/07**

1  regulations did support findings by staff here of the

2  violation of institutional rules.  And it is your lack

3  of 115s commence from 2001.

4      Of significant importance to this Panel is a 115

5  in 1996 that involved threats to your former wife or

6  girlfriend who is not the victim of the assault in this

7  case.  It's a very serious assault.  And if we look

8  back, throughout your, all of your brushes with the law,

9  you have had several different violations of the law

10  including a federal convictions for making threats by

11  the U.S. mail

12      And I would also like to point out that in 1977

13  the victims in that case received a threatening letter.

14  And that ultimately you received a prison sentence for

15  escape.  Now although the escape has nothing to do with

16  threatening letters, it is documented that you were

17  making threats as early as 1977 against either the

18  family of women or women.

19      That this, the life crime involved threats to

20  Ms. Bess, whose married name was Topper.  And that the

21  crime, that murder was in 1983.  And then, if we go

22  further in more recent time, you had a 115 for

23  threatening letters.

24      **INMATE STAICH:**  Yeah, but the psych indicated all

25  **IVAN STAICH      E-10079      DECISION PAGE 3      5/9-10/07**

1 through there, he went through every little of area that

2 you're talking about.

3          PRESIDING COMMISSIONER KUBOCHI:   Sir --

4          INMATE STAICH:   And he discussed all that in the

5 psych report.

6          PRESIDING COMMISSIONER KUBOCHI:   Sir, I'm talking

7 about, I'm not talking about the psych report.

8          INMATE STAICH:   I know.  But he went through all

9 that.  And he's the only professional that has evaluated

10 me.  And he has recommended released.

11          PRESIDING COMMISSIONER KUBOCHI:   I'm not talking

12 about the psychological impact, sir.  What I'm finding

13 is that in 1978 you got a conviction for escape.  And

14 you received a prison, state prison sentence.  Later you

15 got a federal commitment.  This crime resulted in a

16 commitment in 1983 --

17          INMATE STAICH:   Yeah, I understand.

18          PRESIDING COMMISSIONER KUBOCHI:   -- to state

19 prison.  And in 1996 you received a 115 for making a

20 threat.  And there is a long pattern of violations

21 involving threats to women or members of their family

22 since your involvement in the criminal justice system in

23 1978 that had the prison commitment to your last 115 in

24 2001.  That's 23 years.

25 IVAN STAICH      E-10079      DECISION PAGE 4      5/9-10/07

1     **INMATE STAICH:**  Anyway I've never threatened

2  anybody's family.  Anything that was directly related to

3  a threat was within the person itself.  And there is

4  explanations for that as well in the psych report as

5  well if you would have read the whole thing.

6     **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Topper was

7  threatened by you.  He was the wife (sic) of the woman,

8  Cynthia.  By your own admission you had an argument at

9  the door, sir.

10     **INMATE STAICH:**  There is no, I had an argument at

11  the door.  And he threatened me.

12     **PRESIDING COMMISSIONER KUBOCHI:**  And he's dead.

13     **INMATE STAICH:**  He threatened to kill me.

14     **PRESIDING COMMISSIONER KUBOCHI:**  We find --

15     **INMATE STAICH:**  He initiated a threat towards me

16  first.

17     **PRESIDING COMMISSIONER KUBOCHI:**  We find over the

18  period of your first state prison sentence in '78 all

19  the way through your life commitment that included the

20  series of 115s, that's a period of 23 years.  That's a

21  long time.  And so your institutional behavior has not

22  been that good.  And that's in a factor of suitability.

23     Going back over the factors of suitability, you

24  have no juvenile record.  That has been deleted by court

25  **IVAN STAICH**    **E-10079**     **DECISION PAGE 5**    **5/9-10/07**

1    order.  We don't know what that record is.  So that's

2    kind of an even thing.  We're not holding anything

3    against you.  But it was deleted by court order.  So

4    that's kind of not in the mix.

5         Stable social history, I find that your, all of

6    your involvement with the law involved women.  And I

7    would find that you have a very unstable history of

8    relationships with others.  In this particular case, an

9    example of the 67 calls you made while incarcerated to

10   the father of Ms. Bess.

11        In regard to motivation for the crime, which is

12   in the factors of suitability, there is not motivation

13   for you to have been involved in this murder and

14   attempted murder on Ms. Bess that could be within the

15   realms of society.  So the motivation for the crime is

16   not in your favor.  Lack of criminal history is not in

17   your favor because you have been in, you have two

18   separate imprisonments.  You have all --

19        INMATE STAICH:  Those are unchanging factors that

20   are never ever going to change.

21        PRESIDING COMMISSIONER KUBOCHI:  You have all had

22   violations of parole, sir.

23        INMATE STAICH:  I know.  But they're, those

24   things you are talking are ancient history that are

25   IVAN STAICH     E-10079     DECISION PAGE 6     5/9-10/07

1  never ever going to change.

2      PRESIDING COMMISSIONER KUBOCHI:  Understanding --

3      INMATE STAICH:  So what you're doing is changing

4  the crime to first degree murder.

5      PRESIDING COMMISSIONER KUBOCHI:  -- and plans for

6  the future, well we have considered that and --

7      INMATE STAICH:  Well the federal courts have

8  already said in Biggs that you have a limit.  It's a

9  second degree murder.  And you're not going to get away

10  with this.  I know what you're doing.  You're trying to

11  set the record to establish that there is some kind of a

12  jealousy pattern.  That was already overruled in the

13  psych report.  And he is the only professional person

14  that has evaluated me in this whole case.

15      PRESIDING COMMISSIONER KUBOCHI:  Sir, you're

16  arguing.  I'm announcing the decision.  There is a

17  factor --

18      INMATE STAICH:  I know that.  But I can see where

19  you're going with it.

20      PRESIDING COMMISSIONER KUBOCHI:  -- and

21  circumstances tending to show suitability and signs of

22  remorse.  In that regard, the factor there is whether

23  you have given indication that you understand the nature

24  and the magnitude of the offenses.  Although, you

25  IVAN STAICH      E-10079      DECISION PAGE 7      5/9-10/07

1 | verbally state that you're sorry for the crime you

2 | committed, the insights as to your involvement, the

3 | justifications for your involvement, the statements as

4 | to the causation factors lack credibility at this time,

5 | sir.  We feel that you need more time to consider why

6 | you would have such a fixation on this woman.  Once

7 | again, the calls --

8 |         INMATE STAICH:  That's ancient history.  I've had

9 | several, I've been with over 10 women inside the prison

10 | system since then.  So how can you even say that?

11 |         PRESIDING COMMISSIONER KUBOCHI:  I'm talking --

12 |         INMATE STAICH:  One woman?

13 |         PRESIDING COMMISSIONER KUBOCHI:  I'm talking

14 | about before the life crime.

15 |         INMATE STAICH:  Well this is almost 25 years ago.

16 |         PRESIDING COMMISSIONER KUBOCHI:  In regards to

17 | the circumstances tending to show unsuitability, factor

18 | one, the commitment of the crime.  The prisoner

19 | committed the offense in an especially cruel manner.  In

20 | this case here, the two victims were asleep inside

21 | Cynthia Bess' grandfather's home.  You kicked in the

22 | door.  You had cut the phone lines.  And one person

23 | ended up shot and killed after being struck with a

24 | hammer.

25 | **IVAN STAICH      E-10079      DECISION PAGE 8      5/9-10/07**

1      **INMATE STAICH:**  That's why I was shot because he

2   was sleeping.  The gun just got up and pointed at me and

3   shot me.

4      **PRESIDING COMMISSIONER KUBOCHI:**  Ms. Bess was

5   struck by you in such a vicious manner that she has two

6   brain surgeries and suffered irreparable brain damage.

7   Multiple victims were attacked in this particular case,

8   one killed, one seriously injured by you.  The jury

9   verdict was attempted murder on the second victim.

10  Another factor, whether the offense was carried out in a

11  calculated manner, in this particular case, you had made

12  calls while incarcerated.

13      **INMATE STAICH:**  Over 25 years ago.

14      **PRESIDING COMMISSIONER KUBOCHI:**  You were

15  released on parole in November.  Less than 22 days

16  later, one person ended up dead.  And one person ended

17  up with irreparable brain damage.  You went over there.

18  You had a, you brought a hammer.  You cut the phone

19  lines.  This was all calculated, sir.  The victim was

20  abused or mutilated during the offense.  There was no

21  justification to leave Ms. Bess in such a damaged

22  condition.  You could have easily stopped.  You could

23  have easily ceased after kicking in the door.

24      **INMATE STAICH:**  I was all shot up at the time in

25  **IVAN STAICH      E-10079      DECISION PAGE 9      5/9-10/07**

1    complete disarray of my own life and my survival.

2         **PRESIDING COMMISSIONER KUBOCHI:**  And kicking

3    in --

4         **INMATE STAICH:**  And I was being shot at again.

5         **PRESIDING COMMISSIONER KUBOCHI:**  After kicking in

6    the door of a house, after cutting the phone lines,

7    sir --

8         **INMATE STAICH:**  You can keep saying that, 25

9    years ago, go ahead.

10        **PRESIDING COMMISSIONER KUBOCHI:**  The offense was

11   carried out in a manner which demonstrates a callous

12   disregard for human suffering.  There is no doubt that

13   Ms. Bess suffered horrible, horrible pain and damage.

14        **INMATE STAICH:**  That's what happened in the

15   Weider Decision right here.

16        **PRESIDING COMMISSIONER KUBOCHI:**  The motive --

17        **INMATE STAICH:**  The Board did the same to him.

18        **PRESIDING COMMISSIONER KUBOCHI:**  The motive for

19   your crime was inexplicable and very trivial in relation

20   to the commitment offense.  Two, previous record of

21   violence, though in this case here you had threats of

22   violence that resulted in a federal prison --

23        **INMATE STAICH:**  I served my time for that.

24        **PRESIDING COMMISSIONER KUBOCHI:**  Unstable social

25   **IVAN STAICH      E-10079      DECISION PAGE 10      5/9-10/07**

1  relationships again.  You have demonstrated that with

2  the women in your life you have had very unstable

3  relationships prior to your incarceration and conviction

4  for the murder charge.  And as far as institutional

5  behavior, we find 115s as recently as 2001.

6        **INMATE STAICH:**  I'm a Nazarite.  We won that in

7  the United States Supreme Court, the Cutter Decision.

8        **PRESIDING COMMISSIONER KUBOCHI:**  Back to the

9  decision, sir, I've listed the factors.  And clearly,

10 the factors that tend to show unsuitability far outweigh

11 the factors of suitability.  The factors of suitability

12 do include many dynamic factors.  And we find that in

13 regard to your signs of remorse, we find the words

14 lacking in credibility and meaning on your part.  We

15 find them superficial in regard to the causative factors

16 in this case and the way that this crime was committed.

17 These are dynamic factors that you control, sir.

18        In regard to your prior record, as I've indicated

19 you have had a record of threats of violence to other

20 people.  You have an escalating pattern of criminal

21 conduct before the life crime.  You have a history --

22        **INMATE STAICH:**  So you're going to change my

23 crime to life without because you're making these

24 statements?

25 **IVAN STAICH      E-10079      DECISION PAGE 11      5/9-10/07**

1          **PRESIDING COMMISSIONER KUBOCHI:**    -- of unstable

2    and tumultuous relationships with others.  And you

3    failed to profit from society's previous attempts to

4    correct your criminality --

5          **INMATE STAICH:**    (Indiscernible.)

6          **PRESIDING COMMISSIONER KUBOCHI:**    -- especially in

7    the federal parole and the federal conviction for making

8    threats.  Your institutional behavior includes 115s,

9    especially the 1996 threat to your threat to a woman.

10          **INMATE STAICH:**    That's over 11 years ago.  That's

11    ancient history.

12          **PRESIDING COMMISSIONER KUBOCHI:**    And you have

13    participated in a limited manner in group therapy, self-

14    help, self-study.

15          **INMATE STAICH:**    I've taken every program that's

16    available in this prison.

17          **PRESIDING COMMISSIONER KUBOCHI:**    We make a

18    finding that you need therapy in order to face, discuss,

19    understand and cope with stress in a non-destructive

20    manner as well as relationships with women.  Until

21    progress is made, you continue to be unpredictable and a

22    threat to others.

23          **INMATE STAICH:**    How you going to gain this

24    progress?

25    **IVAN STAICH        E-10079        DECISION PAGE 12        5/9-10/07**

1        **PRESIDING COMMISSIONER KUBOCHI:**  Therapy in a

2   controlled setting is needed.  But motivation and

3   amenability are questionable.  In a separate decision,

4   the Hearing Panel finds that the prisoner has been

5   convicted of a very serious murder and attempted murder

6   that involved multiple victims.  And therefore, it is

7   unreasonable to expect that parole would be granted in

8   the next four years.

9        In this particular instance the crime was carried

10  out in a calculated manner.  You had made 67 calls

11  during your incarceration for the federal offense that

12  involved making threats --

13       **INMATE STAICH:**  Over 25 years ago.

14       **PRESIDING COMMISSIONER KUBOCHI:**  -- through the

15  U.S. Postal Service, notwithstanding those collect

16  calls.  Upon your release in November, you immediately

17  implemented a plan to go over, locate this woman --

18       **INMATE STAICH:**  I've not been convicted of making

19  no plan.

20       **PRESIDING COMMISSIONER KUBOCHI:**  You cut --

21       **INMATE STAICH:**  Of second degree murder, no

22  premeditation.

23       **PRESIDING COMMISSIONER KUBOCHI:**  You cut the

24  phone lines.  You kicked in the door.  And thereafter,

25  **IVAN STAICH        E-10079        DECISION PAGE 13    5/9-10/07**

1  one person ended up murdered.  One person ended up with

2  permanent brain damage.

3          INMATE STAICH:  After they opened fire with a gun

4  on me first.

5          PRESIDING COMMISSIONER KUBOCHI:  The second

6  victim was mutilated in that you --

7          INMATE STAICH:  Nobody was mutilated.  They were

8  firing a gun at me.

9          PRESIDING COMMISSIONER KUBOCHI:  -- struck her

10  repeatedly with --

11          INMATE STAICH:  In self-defense.

12          PRESIDING COMMISSIONER KUBOCHI:  -- one of the

13  handguns with such veracity that she suffered

14  irreparable brain damage.  The offense was carried out

15  in a manner that demonstrates a callous disregard for

16  human suffering in that you had many opportunities to

17  cease your involvement with the entire conduct and

18  refused to do so.

19          Your motive for the crimes was inexplicable or

20  very trivial in relation to the offense.  We have also

21  considered the 1996 115 as well as the series of 115s

22  that demonstrate an attitude toward following

23  institutional rules and behavior, the most recent of

24  which was in 2001.  Sir, that is the decision of this

25  **IVAN STAICH     E-10079     DECISION PAGE 14     5/9-10/07**

1   Panel.  And we're denying parole for four years.

2   Commissioner?

3         **DEPUTY COMMISSIONER ALVORD:**  Very briefly.  Sir,

4   it's readily apparent to me that you think that the key

5   to being released from this facility lies within the

6   courts through some type of legal means.

7         **INMATE STAICH:**  It does.  You can't keep second

8   degree murder in for life without.  That's what you're

9   doing.

10        **DEPUTY COMMISSIONER ALVORD:**  Sir, I'm going to

11  put my statement on the record either --

12        **INMATE STAICH:**  You are using this as a court

13  trial.

14        **DEPUTY COMMISSIONER ALVORD:**  -- with you here or

15  without you here.

16        **INMATE STAICH:**  I know.  That's fine.  Go ahead.

17        **DEPUTY COMMISSIONER ALVORD:**  Well I'm not going

18  to do it if you interrupt me.

19        **INMATE STAICH:**  I won't.  Go ahead.

20        **DEPUTY COMMISSIONER ALVORD:**  Quite frankly, I

21  feel you would be far better served by taking more self-

22  help classes.  What I see is a very bright fellow who

23  has adjusted to the prison environment.  And that's

24  clear by the fact that your disciplines have been fairly

25  **IVAN STAICH      E-10079      DECISION PAGE 15      5/9-10/07**

94

1  good within the facility.  The problem is I also see in

2  the same fellow that committed the life crime 25 years

3  ago.  I don't see any change in you.  What I see is a

4  complete lack of insight.  And that's reinforced, in my

5  mind at least, through the 1996 115 that's almost

6  identical to the events of 25 years ago.

7       INMATE STAICH:  Yeah, but you're --

8       DEPUTY COMMISSIONER ALVORD:  I would --

9       INMATE STAICH:  -- not letting me expound on

10  that.  You guys --

11       DEPUTY COMMISSIONER ALVORD:  I thought you

12  weren't going to interrupt me.

13       INMATE STAICH:  I'm not.  I'm just telling, I

14  have to put facts --

15       DEPUTY COMMISSIONER ALVORD:  I thought what, what

16  I would suggest you do --

17       INMATE STAICH:  -- for my own attorney.

18       DEPUTY COMMISSIONER ALVORD:  What I would

19  suggest, I strongly suggest that what you should do is

20  get self-help.  Go to the library.  Get as many books as

21  you can on self-help to try to change who you are

22  within.  I think that's the key to your eventual

23  release.

24       INMATE STAICH:  I have done that, Sir, whether

25  **IVAN STAICH    E-10079    DECISION PAGE 16    5/9-10/07**

1  you want to recognize that or not, that's up to you.

2       **DEPUTY COMMISSIONER ALVORD:**  With that I wish you

3  good luck.

4       **INMATE STAICH:**  Can I put some stuff on the

5  record here?

6       **DEPUTY COMMISSIONER ALVORD:**  It's 3:30 p.m.  This

7  hearing is concluded.

8       **INMATE STAICH:**  That's what I thought.

9       **DEPUTY COMMISSIONER ALVORD:**  And we are off the

10  record.

11       **INMATE STAICH:**  You never gave me a chance to put

12  any objection on the record, did you?  We'll see how the

13  Court likes that.

14                          --oOo--

15

16

17

18

19

20

21  PAROLE DENIED FOUR YEARS

22  THIS DECISION WILL BE FINAL ON:_____

23  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

24  DATE, THE DECISION IS MODIFIED.

25  IVAN STAICH      E-10079      DECISION PAGE 17      5/9-10/07

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Sarah M. Collins, as the Official Transcriber,
hereby certify that the attached proceedings:

| | | |
|---|---|---|
| In the matter of the Life | ) | CDC Number:  E-10079 |
| Term Parole Consideration | ) | |
| Hearing of: | ) | |
| | ) | |
| IVAN STAICH | ) | |
| ———————————————————— | ) | |

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 9 & 10, 2007

12:58 P.M.

were held as herein appears.  Further, this transcript
is a true, complete and accurate record, to the best of
my ability, of the recorded material provided for
transcription.

————————————————————————
Sarah M. Collins
July 16, 2007
Capitol Electronic Reporting